## THE BERNICIA.

### (District Court, S. D. New York.   May 9, 1903.)

1. COLLISION—DUTY OF OVERTAKEN VESSEL AT NIGHT—STERN LIGHT.
    Under article 10 of the international navigation rules (Proc. Dec. 31, 1896; 29 Stat. 887), which requires a vessel which is being overtaken by another to show from her stern to such last-mentioned vessel a white light or a flare-up light, and provides that the white light may be fixed and carried in a lantern screened to show over an arc of 12 points, if an overtaken vessel elects to use a flare-up light, instead of a set screened light, it is her duty at least to maintain an efficient lookout astern, and to display the flare-up light as soon as an overtaking vessel can be seen.

2. SAME—STEAMER OVERTAKING SCHOONER—FAILURE OF SCHOONER TO SHOW LIGHT.
    A heavily laden schooner, sailing closehauled, 4 miles off the shore of Cape Cod, on a dark and overcast, but fairly clear, night, was overtaken and sunk in collision by the steamer Bernicia, which was on the same course, and going at a speed of 10 knots, while the schooner was making about 1½ knots.  The steamer carried side lights and a masthead light, which could have been seen a mile or more.  She was at the time in charge of a competent mariner, well acquainted with the locality, and had an efficient lookout; but the schooner was not seen and could not have been until she was only about 150 feet distant, and too late to avoid the collision, although the steamer immediately put her helm hard aport.  The schooner carried no stern light, and no light which could be seen from the steamer, but had a flare-up in the cabin, ready to light. She kept no lookout astern, and did not see the steamer in time to show the light before collision.  *Held*, that the schooner was in fault for not keeping a lookout astern and exhibiting a stern light to the steamer, as required by the rules; that the Bernicia, under the facts shown, was not in fault.

In Admiralty.   Suit for collision.

. Charles C. Burlingham, for libelant. ·
J. Parker Kirlin, for claimant. ·

HOLT, District Judge.  This is a suit to` recover damages caused by a collision between the schooner Nimrod and the steamship Bernicia, off Cape Cod, on the night of March 19, 1903.  The Nimrod was a three-masted schooner, 257 tons register, 132 feet long, and 30 feet beam.   At the time of the collision she was on a voyage from Maine to New York, with a cargo of 480 tons of granite blocks.  The Bernicia is a screw steel steamship, of 2,178 tons register, 347 feet long, and 47 feet beam.   On the night of the collision she was on a voyage in ballast from Portland, Me., to New York.   The sky was overcast, and the night was very dark, but until a few minutes before the collision the atmosphere was clear, so that lights could be seen a long distance, but dark objects only a short distance on the water. About 11:30 at night, the time of the collision, the Nimrod was sailing on a southerly course, closehauled, on the starboard tack.   The wind was west southwest and light.   The Nimrod was making about a knot and a half an hour.   She had six men on board.   Three were on deck—the captain at the wheel, a seaman forward as lookout, and the mate.   Just before the collision the captain noticed that the weather was becoming hazy, and directed the mate to go forward and

see that the lookout was attentive. The mate went forward, and at the time of the collision was lying down on deck forward. The Bernicia came up astern of the schooner. She was heading southerly, on the same course, and was making about 10 knots an hour. Her captain at Portland had employed Capt. Adams, of Portland, as a sort of pilot, to advise and assist in the navigation of the steamer from Portland to New York. Capt. Adams had had a large experience in the command of vessels on the New England coast and elsewhere, and held a master mariner's license, authorizing him to command any kind of vessel in any part of the world. Immediately previous to the collision, the second officer, Capt. Adams, and the wheelsman were on the bridge, and there was a lookout forward on the forecastle head. Capt. Adams noticed that Nauset light, about seven miles distant, began to be somewhat dimmed by haze. He took the bearing of the light, and stepped into the chartroom, a few feet distant, in order to make a record of his bearing. A few seconds after he entered the chartroom, the second officer on the bridge and the lookout forward both saw the upper sails and masts of a schooner immediately ahead, about 150 feet away. The second officer immediately gave the order to port the helm, and it was immediately done, but, before the change of helm made any impression on the direction of the steamer, the bluff of the steamer's bow on the port side struck the schooner a little to the right of the center of the stern, and crushed in and carried away the schooner's starboard quarter. A part of the crew of the schooner jumped aboard the steamer as she drifted by. The schooner sank in a few minutes. The rest of the crew were saved on wreckage, and rescued by boats from the steamer after the schooner sank. The schooner had no set stern light, but carried a flare-up light, which was in the cabin, ready to be lighted that night. The schooner showed no stern light that night at any time, and was not more than from 150 to 300 feet from the steamer when first seen on the steamer. Both vessels had the proper green and red lights burning forward, and the steamer had the proper masthead light burning, also.

On these facts, I think that the schooner was in fault for not exhibiting a stern light to the steamer, and for not keeping a good lookout astern. The tenth rule of navigation is as follows (Proc. Dec. 31, 1896; 29 Stat. 887):

"A vessel which is being overtaken by another shall show from her stern to such lastmentioned vessel a white light, or a flare up light.

"The white light required to be shown by this article may be fixed and carried in a lantern, but in such case the lantern shall be so constructed, fitted and screened that it shall throw an unbroken light over an arc of the horizon of twelve points of the compass, viz., for six points from right aft on each side of the vessel, so as to be visible at a distance of at least one mile. Such light shall be carried as near as practicable on the same level as the side lights."

The libelant's counsel claims that under this rule an overtaken vessel has an option to use at the stern either a white light or a flare-up light, or a fixed and screened white light, and that, if she chooses to use a flare-up light, all that is required of the overtaken vessel is that, as soon as she sees or can reasonably be expected to see the overtaking vessel, she shall show a flare-up light, if there is time to do so. It is

true that under this rule the master of a vessel has an option to use either kind of light, but I think, if he chooses to use a flare-up light, instead of a screened light set at the stern, there are strong grounds for holding that he is bound to make it as efficient as the set light, and that it is no defense that he had not time to get it, light it, and show it after the overtaking vessel was seen or might have been seen. If he uses a flare-up light, of course, a lookout astern is necessary. If he uses a set screened light, no lookout astern is necessary. The set light looks out itself. Before 1885 there was no rule specifically providing for an overtaken vessel showing a stern light. The only rule that applied to such a case was that every sail vessel "shall, on the approach of any steam vessel during the night time, show a lighted torch upon that point or quarter to which such steam vessel shall be approaching." Rev. St. U. S. § 4234. In 1885 the first paragraph of the present rule was adopted. Act March 3, 1885, art. 11; 23 Stat. 440, c. 354. It was taken from an English rule in substantially the same language. It did not provide for a fixed light, but provided that either a white light or a flare-up light should be shown from the stern when a vessel was being overtaken by another. Indeed, no rule then authorized a fixed stern light, and its use was then probably illegal. Marsden on Collisions (4th Ed.) p. 421, and cases cited. Under this rule, it was held that no duty to show a light arose till the vessel which was being overtaken had had an opportunity of seeing that the vessel which was overtaking her was a vessel coming nearer to her, and that then only the duty arose to give the specified warning within a reasonable time. The Main, 11 P. D. 132. In 1890 the present rule was recommended by the maritime commission, and approved by Congress. Act Aug. 19, 1890, 26 Stat. 320, c. 802 [U. S. Comp. St. 1901, p. 2863]. But it was not to go into effect until a time to be fixed by the President by proclamation, and such proclamation was not issued till 1896 (Proc. Dec. 31, 1896; 29 Stat. 885). The present rule, therefore, is of comparatively recent origin, and no case construing it, in respect to the point under consideration, has been called to my attention. But it seems to me that, under the present rule, if an overtaken vessel chooses to use a flare-up light, instead of a set screened light, she is bound to use it in such a manner as to make it equally effective. Without definitely deciding this question, however, it is clear that, if a flare-up light is to be used, an efficient lookout astern must be maintained, and the flare-up light displayed as soon as an overtaking vessel can be seen on the overtaken vessel, in order to have the overtaken vessel comply with the rule. The evidence in this case, in my opinion, is clear that the masthead light and the side lights on the Bernicia might have been seen that night from the Nimrod when at least a mile, and probably farther, astern. As the Bernicia was going at the rate of about 10 knots an hour, and the Nimrod at about 1½ knots, there was a period of at least six minutes in which the lights of the Bernicia were visible on the Nimrod. This was ample time for the flare-up light on the Nimrod to have been lit and shown astern in season for the Bernicia to have avoided the collision. The Nimrod, therefore, in my opinion, was clearly at fault. The Sarmatian (C. C.) 2 Fed. 911; The Algiers (C. C.) 28 Fed. 240.

I cannot see that the Bernicia was at fault. The Bernicia, of course, was bound to keep out of the way of the Nimrod, if she could see her in time, notwithstanding she showed no light. The libel alleges that the Bernicia was not in command of a competent person; that she did not keep a good lookout; that, although she was proceeding through waters which are usually crowded with sailing vessels, she did not proceed cautiously and with due care; and that, although she was a steam vessel, and was overtaking the Nimrod, she did nothing to avoid her. I think the evidence does not support these charges. She was in command of a competent person, and she kept a good lookout. She was not in waters in which the law required her to have a pilot, and the fact that the captain had employed Capt. Adams to assist in piloting the steamer on that voyage shows that unusual care was taken in her navigation on that trip. She was at the time of the collision on the open ocean, four miles from the Massachusetts shore, and, although in waters where sailing vessels are frequently met, she was not in the most crowded part of the course way. Most coasting vessels passing up and down by Cape Cod go two or three miles nearer the shore. The Bernicia had a right to be going at her usual speed. The night, though dark, was clear. No haze was noticed until immediately before the collision; and even then Nauset light, seven miles distant, could be seen, though the haze made it somewhat dim. There was a heavy fog a short distance further south, and it would have been soon the duty of the Bernicia to moderate her speed and blow fog signals, but it was not yet her duty. The schooner was so heavily laden that she was low in the water, having but about a foot of freeboard. Being closehauled, her sails, to a vessel overtaking her from astern, presented but a narrow outline. The night was dark, the sky being overcast. A heavy bank of fog lay on the water a little further south, so that the background was very dark in that direction. Under these circumstances, such an object as the schooner, without any lights being exhibited, could only be seen a very short distance on the water. The evidence satisfies me that a vigilant watch was kept on the Bernicia, both by the lookout, by the second officer, and by Capt. Adams, and that they did not, and in fact could not, see the schooner until they were within about 150 feet of her. The helm was immediately ordered hard aport, and every proper step taken to avoid a collision, but the steamer was so close to the schooner that she ran her down before the helm had any effect on her direction.

Some attempt was made in the evidence to show that the binnacle light and the cabin lights on the Nimrod could have been seen from the Bernicia, but in my opinion the evidence shows that they could not have been seen, and were not seen. Moreover, they were not lights which complied with the tenth rule (Proc. Dec. 31, 1896; 29 Stat. 887). The Breadalbane, 7 P. D. 186; The Patroclus, 13 P. D. 54.

My conclusion is that the libel should be dismissed on the merits, with costs.