## THE ALABAMA. THE CURTIN. THE C. C. McILWAINE.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1903.)

### No. 494.

1. COLLISION—STEAMER AND BARGE—NEGLIGENCE—NAVIGATION BY TUG.

A tug entering the harbor of Norfolk in the evening, with four barges in tow, took the left-hand side of the channel, and when opposite a pier detached the first barge, and allowed it to proceed by its momentum toward the shore, across the course of an outgoing steamer, with which it came into collision. The tug gave no signal prior to casting off the barge, but at about that time crossed the signal of one whistle from the approaching steamer. *Held*, that in attempting such maneuver without a clear understanding with other vessels she was negligent and in fault for the collision.

2. SAME.

A barge without motive power, which was cast off by a tug and sheered toward a pier for anchorage, was not in fault for a collision

with a passing steamer; it being the duty of the tug to determine the place and time for the maneuver, and whether the way was clear, and whether proper signals to approaching vessels had been given.

3. SAME—DUTY OF STEAMER MEETING TUG WITH TOW.

While it is the duty of a steamer having full control of her own movements to keep out of the way of a tug incumbered with tows, she is not bound to anticipate negligent maneuvers on the part of the tug or a violation of the rules of navigation.

4. SAME—EVIDENCE CONSIDERED.

A steamer on leaving her dock in the evening, taking the right-hand side of the channel, near the shore, saw the lights of a tug and four tows coming up the channel in a line, one or two points off her port bow. She gave a signal of one whistle, which was answered by a cross-signal by the tug, which at the same time cast off one of her tows, and sheered it toward the shore, and it came into collision with the steamer. The steamer had proceeded but three or four lengths from her pier, and had already stopped and reversed on account of anchored vessels ahead, and was moving backward at the time of collision. *Held*, that she was not bound to anticipate the action of the tug in casting off the tow, and was not in fault for the collision, it appearing that she had a competent and vigilant lookout, and in the absence of evidence showing that she should have seen the approaching tow before she did, or that her speed was at any time excessive.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk. In Admiralty.

For opinion below, see 114 Fed. 214.

Robert M. Hughes, for the Alabama.

James E. Heath, Jr., for the Curtin.

Edward R. Baird, Jr., for the C. C. McIlwaine.

Before SIMONTON, Circuit Judge, and MORRIS and KELLER, District Judges.

MORRIS, District Judge. This is a libel for collision filed by the owner of the barge C. C. McIlwaine against the steamer Alabama and the steam tug Curtin for damages to the barge, which, while in tow of the steam tug, was struck on her starboard bow about 10 feet aft of her stem in a collision with the steamer Alabama. The owner of the barge proceeded against both the steam tug and the steamer, alleging that both were in fault. The District Court so held, and decreed that the damages be paid in equal parts by the owners of the steam tug and the steamer. From that decree the owners of both the steam tug and the steamer have appealed.

The collision occurred in the harbor of Norfolk after dark, between 6 and 7 o'clock in the evening of January 16, 1901. The steam tug Curtin had brought a tow of four barges loaded with coal down the Chesapeake Bay from Chesapeake City, Md., into Norfolk Harbor. The McIlwaine was the barge next to the tug, and it was designed to cut her out of the tow, and let her sheer to the eastward and anchor in the harbor opposite the pier of the Nottingham & Wrenn Company, to which the barge with her cargo of coal was consigned, the tug intending to take the remaining barges further up in the harbor. When the tug had her tow opposite to Pinner's Point, some distance below the Nottingham & Wrenn Pier, the tug shortened the hawser of the barge McIlwaine, and it was agreed between her master

and the master of the tug that at a convenient point near the Nottingham & Wrenn Pier the barge should be cast off and be permitted to sheer to the eastward to an anchorage. Accordingly, when the tug reached a point about opposite the wharf, she stopped her engines, and directed the barge to cast off the hawser and starboard her helm. The barge did as directed, and sheered across the channel to the eastward, with the result that she came into collision with the Alabama.

The Alabama, a large passenger steamer over 300 feet in length and 54 feet beam, fully manned with a lookout stationed forward, a quartermaster at the wheel, and the master and second mate both in the pilot house, had just started from her wharf, which is about one-third of a mile above the Nottingham & Wrenn Pier, for her night trip up the Chesapeake Bay to Baltimore. The testimony of those in charge of her is that when the Alabama had cleared her wharf her lookout reported and they all saw a tug and her tow from one to two points on the Alabama's port bow showing their red lights all in a line; that the master of the Alabama ordered her wheel to port, and blew one whistle, and observing some lights of anchored vessels on his starboard bow, lying near Nottingham & Wrenn's Wharf, he turned the steamer's searchlight on them, and finding that they were swinging with their bows pointing westwardly across the channel, and obstructing the eastward side of the channel, he ordered his engines reversed. Then, turning the searchlight to the port, he saw the barge sheering away from the tug, and diagonally across the channel, heading northwardly, pointing for the steamer's forward gangway, and about two of the barge's lengths off. The barge forged ahead, and the bluff of her starboard bow came in contact with the steamer's port side, but, as the steamer had begun moving astern, the barge slid forward on the steamer and across her bow, and continued towards the eastern side of the channel.

The master of the steamer and other witnesses testified that it was after he and they, with the aid of the steamer's searchlight, had made out that the barge was adrift, that the tug blew him a signal of two whistles. At the time when the Alabama blew her signal of one whistle the tug's master and mate had left the tug's pilot house and gone aft to attend to the cutting out of the barge, and had sent the tug's cook to act as lookout and take charge of the pilot house. The cook, hearing the Alabama's signal of one whistle, leaned out of the pilot house door, and, calling out to the master who was at the stern, reported the signal to him. The master directed him to blow in reply a signal of two whistles, and paid no further attention to the steamer or her signal.

There can be no doubt that the tug attempted a hazardous maneuver in cutting out one of the barges of her long tow after dark in the channel of a harbor where there were a number of steamers starting on their night trips, and it is evident that those in charge of her conducted the business improperly and carelessly, in that they had no lookout, and placed an incompetent man in the pilot house in charge of the wheel, and turned the barge adrift to forge across the channel without giving a danger signal to the approaching steamer.

The Alabama, as soon as she was clear of her wharf, gave a signal

of one whistle, indicating that she was going to keep to the side of the channel on her starboard hand. This was her proper course, unless there was apparent to her master something that indicated that it was improper. The master and all who were on the Alabama, who were in a position to see, testify that they saw the red lights of the tug and all four of the barges in her tow, off the Alabama's port bow. With the master of the Alabama, the lookout, the quartermaster, and the second mate all observing the tow, and all testifying most positively that they all saw the red lights off the Alabama's port bow, it must be accepted as proven that they did see what they have sworn to, and it is confirmed by the order then given by the master to port the wheel, and by his blowing a signal of one whistle. It is highly improbable, if the green lights of the tug and the barges had been visible, indicating that the tug and barges were heading for the eastern side of the channel, that the experienced master of the Alabama would have ported his wheel and run directly into such obvious danger. The witnesses from on board the Alabama testify also that their steamer was well over on the eastern side of the center of the channel, and this is supported by the acts of the master with regard to the schooners anchored on that side of the river. The master testifies that after giving the signal of one whistle, and ordering the wheel to port, he saw the anchor lights of some vessels ahead, and he ordered his engines stopped, and had the searchlight turned on them, that he might determine just how they lay, and he then discovered one schooner rather far out in the channel, with her jibboom pointing across it, and he then reversed his engines, and just then, the searchlight having been turned across his port bow, he saw the barge close at hand on his port side, and forging ahead under a starboard helm towards the bow of the steamer. Just as the searchlight disclosed the barge the tug blew her signal of two whistles.

The faults of the tug are evident. She should not have stopped her long tow in the channel, and attempted to cut out one of the barges, and sheer it across the channel in the face of the outcoming steamer, without the greatest care and precaution. She should, before she cast off the barge, have had a clear understanding by exchange of signals with the steamer. Instead of giving a cross-signal of two whistles in answer to the steamer's signal of one whistle, she should have given danger signals as a warning to the steamer that her situation did not permit her and her tow to pass port to port. The tug should not have been left without a lookout and without a competent pilot in the wheel house. The absence of any competent navigator in the wheel house at such a time, when skill and promptness were very necessary, should, of itself, lead the court to resolve doubtful points against the tug.

Against the steamer it is urged that she did not keep a proper lookout; that she was going too fast; that she did not stop and reverse; that she should have shaped her course to her port instead of to starboard; that she should have gone more to starboard after crossing to that side of the channel; that it was her duty to keep away from the barge, which was helpless and without motive power.

It appears to us that the evidence shows that the steamer's lookout

was competent and vigilant; that her speed was very moderate, and must have been so, as she had not gone more than three or four lengths from her wharf when her engines were reversed. We think it is shown that at the first appearance of danger—that is to say, when the master of the steamer saw the extreme eastern side of the channel was obstructed by vessels at anchor—the steamer's engines were at once stopped, and almost immediately were reversed.

We have already said that when the steamer saw the red lights of the tug and barges off her port bow there was no reason apparent why she should not keep to the starboard side of the channel to which the rules prescribe she should keep if safe and practicable. When she received the improper cross signal of two whistles from the tug the steamer was backing, and was doing all she could possibly do to avoid doing damage to either the anchored vessels or the tug. She would have done no damage to any vessel if it had not been that the barge sheered away from the tug over to the eastern side of the channel and across the bow of the steamer. That the steamer had overcome her headway and was going astern was shown by the fact that the steamer did not carry the barge along by her momentum and greatly superior weight, but the barge, with her slight headway, passed across the bow of the steamer.

The only question as to the fault of the steamer to be resolved is whether or not the sheer of the barge should have been sooner observed, and, if it had been, could the steamer have avoided her. The Alabama was under no duty to expect that the tug might break up her tow at that place in the channel and set any of the barges loose. The steamer had a right to proceed down the harbor slowly, keeping under command, and able to safely pass all vessels complying with the rules of navigation.

The barge, when her hawser was thrown off, was near to the tug, which had backed close to her to take from her the hawser of the next barge behind her. It would not be reasonable to expect those on the steamer to make out the barge, as detached from the tug and other barges, until she had sheered some distance. The master of the barge testified that he was cast off just as the tug blew her signal of two whistles. At that time the steamer had reversed her engines. The barge was seen by those on the steamer, with the aid of the searchlight, when she was about a steamer's length off. That was as soon as she reasonably could be made out as separated from the tug. It does not appear what the steamer then could have done to avoid the barge except to reverse her engines and go astern, and that she had already done. In our judgment the steamer has not been shown to be in fault.

In the opinion of the learned and careful judge of the District Court some stress was put upon the fact that the tug was an incumbered vessel, and that, therefore, the steamer was in the situation of an obligated vessel, and her duty was to keep out of the way. But the duty of the steamer was determined by what it was reasonably possible for her to see of the tug's situation. An unincumbered steam vessel undoubtedly should be so navigated as not to embarrass an incumbered tug which can be seen to be hampered in her move-

ments. But when those on the steamer saw the red lights of the tug and barges on their port bow there was nothing to indicate that the tug was hampered or embarrassed, and could not pursue the usual course up the channel. She gave no signal to indicate that she was about to stop and break up her tow in the channel in the dark. The steamer proceeded at a very moderate speed, and moved with caution, and when the risk of any trouble was discerned immediately reversed her engines. This is a state of facts altogether different from that in the leading case of The Syracuse, 9 Wall. 672, 19 L. Ed. 783, in which the Supreme Court commented upon the duty of the unincumbered vessel. The difficulties of the situation just before the collision were not such as the master of the steamer could reasonably foresee, and were brought about by the negligent maneuvers of the tug, and are not of that class which the unincumbered vessel is required at her peril to avoid.

We think the District Court was entirely right in holding the barge free from fault. The understanding between the master of the barge and the master of the tug was that at the proper time and place the hawser should be cast off, and the barge, under a starboard helm, sheer· off towards the anchorage at Nottingham & Wrenn's Pier. It was the duty of the tug to determine the place and time and whether the course was clear and whether proper signals to approaching vessels had been given. The tug failed in this duty, and the damage to the barge resulted. As to the lights of the barge, we do not think the opposing evidence disproves the testimony that they were properly burning. That they were not distinguished by those on the steamer is fairly attributable to the confusion of the lights of the tug and barges, when the tug backed in among the barges, and the lights on the anchored schooners, and to the dimming effect of the steamer's searchlight when thrown upon the lights of the barge. We find the tug solely in fault for the collision.

It is urged that the amount allowed as damages for the injury to the barge was excessive. The ascertainment of the damages was referred to a special commissioner, who took a great deal of testimony, and reported the amount paid by the owner of the barge for repairs to be $1,625, and that the barge had been impaired in value to the extent of $1,000 not made good by the repairs. This allowance of $1,000 was earnestly contested before the commissioner and before the District Court on exceptions to the report. The learned judge of the District Court carefully considered the evidence and the exceptions, and sustained the allowance of $1,000 for impaired value reported by the commissioner.

The allowance of $1,000 for permanently impaired value belongs to a class of damage which is to be most carefully scrutinized and should not be allowed unless supported by convincing proof. Mere conjectural depreciation arising from the fact that a vessel has been in collision, and may therefore be weaker or less salable, is too speculative to be allowed. But a real, visible, and known depreciation, which cannot be repaired except at a great cost, when convincingly established by proof, is proper to be allowed.

126 F.—22

In the present case the claimant of the barge immediately after the collision, and upon expert surveys, had such repairs made as were required to make the barge serviceable, at a cost of $1,628, the reasonableness of which is not controverted. The barge, however, being heavily loaded with coal when in collision, received a twist of her whole structure, which, beginning at about 60 or 70 feet aft from her bow, resulted in throwing the stem seven inches out of line to the port. The great preponderance of proof establishes that such a twist necessarily wrenched the timbers and planks at their fastenings and weakened the whole structure; that the life of a barge so injured was necessarily shorter, and her liability to yield to the wear and tear of use greater, and that her salable value was diminished by $2,000. It was proven that the cost of repairing her in such a way as to remedy the twist and remove the strained frames and joints would have been not less than $4,000. The barge had been built for the present claimant, under his own superintendence, at a cost of between $6,000 and $7,000, and was only three or four years old, and was in good condition prior to the collision. The claimant was entitled to have his loss made good to him. It would have cost an extravagant sum to have taken the barge apart and rebuild her so as to remedy the effects of the blow and the consequent twist in her structure. The proof was entirely convincing that a structural weakness had resulted which would lessen the duration of her usefulness, and had very seriously diminished her salable value. Making all reasonable allowances for the fact that the impairment of value was a matter of estimation, we think that $1,000 allowed by the decree below was reasonable and proper.

The other items of damage allowed all seem proper and customary.

Decree modified, with direction to dismiss the libel as against the steamer Alabama, and to enter a decree against the steam tug Curtin for the whole damage, with costs. Decree modified.

### On Rehearing.
#### (Dec. 10, 1903.)

PER CURIAM. We have carefully examined the petition for rehearing in this case; the cause having been submitted to us on further arguments, which, with the briefs, had received our careful consideration. We see no reason for reconsidering the question. The petition for rehearing is dismissed.