## THE AUGUSTA G. HILTON. THE GEORGE WASHINGTON. ATLANTIC COAST CO. v. UNITED STATES.

(District Court, Dist. New Jersey. January 29, 1925.)

1. **Collision** ☞79—**Evidence held to prove owner of schooner at fault because of failure to maintain stern light, while being overtaken by respondent's steamship.**

In libel by owner of schooner for damages sustained in collision between schooner and respondent's steamship, evidence *held* to prove libelant at fault because of failure to maintain stern light while being overtaken by steamship, as required by International Rules of Navigation, arts. 1, 10, 29 (Comp. St. §§ 7837, 7848, 7868).

2. **Collision** ☞75—**Rule of International Rules of Navigation requiring stern light on vessel being overtaken by another is mandatory.**

International Rules of Navigation, art. 10 (Comp. St. § 7848), providing that a vessel which is being overtaken shall show a stern light, is mandatory, and requires display of such light, where officers of vessel have knowledge of position of vessel by which it is being overtaken, regardless of whether such officers think or are convinced that they are being overtaken.

**3. United States ⟨⟩125—Government-owned steamship, bound for certain port for reconditioning under government's contract, held not engaged in merchant service, and immune from suit for collision.**

Government-owned steamship, bound for certain port for reconditioning pursuant to contract between Shipping Board and steamship company, by which it was to be chartered when reconditioned, had not, during such trip, entered the merchant service, and was therefore immune from liability to be sued for damages caused by collision, in view of inherent immunity of the government, notwithstanding Act Sept. 7, 1916, and Act March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*).

In Admiralty. Libel by the Atlantic Coast Company, as owner of the schooner Augusta G. Hilton, against the United States, as owner of the steamship George Washington. Libel dismissed.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Remsen Cowenhoven, of New Brunswick, N. J., for libelant.

Walter G. Winne, U. S. Dist. Atty., of Hackensack, N. J. (De Lancey Nicoll, Jr., and Ralph B. Romaine, both of New York City, of counsel), for the United States.

RUNYON, District Judge. This action is brought as the result of a collision between the steamship George Washington and the schooner Augusta G. Hilton, which occurred off the Massachusetts coast on July 20, 1921.

The George Washington at the time was bound from the port of Boston to the port of New York, there to finish her reconditioning and take her place as a merchant vessel of the United States. She had left Boston at 4:30 p. m., July 19, and was proceeding in a general southeasterly direction when the accident occurred.

The Hilton, close-hauled upon the starboard tack, was on her way from Boston to Hampton Roads, Va., and had reached a location about 50 miles south of Chatham Light; the weather being foggy, and a light, southwesterly breeze blowing. She had a lookout stationed on the forecastle, charged with the duty of keeping a lookout ahead and sounding the foghorn, a man stationed at the wheel, and, in addition thereto, the second mate, who was on watch at the time, and the master of the vessel were standing at the rear of the schooner.

The George Washington, going at a speed of about 12 knots per hour, and sounding her whistle from time to time, approached the Hilton astern, hit the schooner's stern with her port bow, and tore off her starboard quarter. At this point the stories of the accident differ widely; those on the schooner claiming that almost immediately after the collision the George Washington, without stopping to ascertain the damage or the need for help, disappeared in the fog. On the other hand, the officers and crew members aboard the George Washington claim that their vessel after the collision circled in search of the schooner, blowing short blasts of her whistle continuously, and for the better part of an hour endeavored to locate the smaller vessel. Being altogether unsuccessful in her quest, the steamer resumed her journey toward New York.

[1] In reviewing the evidence in this case, and searching for the circumstances and conditions which were responsible for the collision, I am impressed with the fact that the testimony shows those in charge of the Augusta G. Hilton as failing altogether to comply with the specific articles of the International Rules of Navigation regarding lights. Article 1 of those rules (Comp. St. § 7837) directs that:

"The rules concerning lights shall be complied with in all weathers from sunset to sunrise, and during such time no other lights which may be mistaken for the prescribed lights shall be exhibited."

Article 10 (Comp. St. § 7848) further directs that:

"A vessel which is being overtaken by another shall show from her stern to such last-mentioned vessel a white light or a flare-up light.

"The white light required to be shown by this article may be fixed and carried in a lantern, but in such case the lantern shall be so constructed * * * and screened that it shall throw an unbroken light over an arc of the horizon of twelve points of the compass, namely, for six points from right aft on each side of the vessel, so as to be visible at a distance of at least one mile. Such light shall be carried as nearly as practicable on the same level as the side lights."

While article 29 (Comp. St. § 7868) declares that:

"Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

Robert T. Maker, second mate of the schooner, the officer on watch at the time of

the collision, was questioned and answered as follows:

"Q. You did not carry any fixed stern light, did you? A. No, sir.

"Q. And you had not shown any light of any kind astern, even though you knew the sound of this steamer came from your stern; that is correct, is it not? A. Yes, sir."

In subsequent testimony, however, this witness said that when he heard the steamer's first blast he did not know that she was overtaking or coming in the direction of the schooner, but stated that he did not consider it necessary to show a flare-up or a bright light upon hearing the steamship's whistle the first time, giving his reason in the following words:

"Because, if every time that you hear a whistle in the distance you show a white light, you would have to have a cargo of lights—you would have to have an immense lot of them—if you show a bright light every time you hear a whistle."

In this connection it is pertinent to note that Peterson, the man at the schooner's wheel, being asked how many times he heard the steamer's whistle after he heard the mate tell the master that there was a steamer on the port quarter, and before he ran from the wheel, said: "Well, I don't know—three or four times." Further extracts from his testimony show the following:

"Q. Three or four times. Well, now, did each one of those sounds come from the same direction as the first one, apparently? A. Yes.

"Q. And when you saw the steamer, when she was right on top of you, as you said; was that the same direction as the direction in which you had heard these signals before? A. Yes, sir.

"Q. So that she appeared to keep coming right along towards your stern? A. Yes.

"Q. And you heard each one of those three or four signals? A. Yes, sir."

In subsequent answers upon this point, both on direct and cross examination, Peterson gave his estimate of the number of times he heard the steamer's whistle after the first blast as:

"Two and three, I am not sure." "I am not sure; three and four, but not more than four." "Three and four; I don't know."

"Q. Or it might have been two, might it not? A. Yes; I didn't count them."

All the other witnesses for libelant practically unite in saying that there were but two blasts of the steamer's whistle; the initial one, concerning which the mate, Maker, testified, and a second blast, heard virtually

at the instant the George Washington emerged from the fog and little over 200 feet distant from the schooner, except that the witness Frandsen, who until 1 a. m. had been acting as lookout and blowing the horn, and thereafter went on deck as standby man, testified that he saw the on-coming steamer when she was in the neighborhood of a couple of hundred fathoms distant from the schooner.

But, whatever be the variations upon these lesser points, the compelling fact is that those responsible for the Hilton's management elected to adopt neither one of the safety procedures laid down in the International Rules. The spirit as well as the letter of these rules might have been maintained, had a fixed stern light, answering the requirements of the rules, been installed; and while, in addition thereto, owing to the fog of the night, and pursuant to the "ordinary practice of seamen," or "the special circumstances of the case," extra precautions might have become necessary, the presence of such a light would, nevertheless, have constituted a positive compliance with the rules, so far as its existence or power could accomplish the end sought.

The same purpose also might have been accomplished had a flare-up light been used; but this option was likewise ignored by the Hilton. And even if the officers of a vessel elect to use this form of light, rather than the fixed white light, the fact must not be overlooked that, on account of its temporary nature, those who elect to use this form of signal must be held to a high degree of responsibility, since its warning purpose can only be accomplished where and as determined upon by those charged with its functioning.

[2] The language of article 10 of the rules is mandatory: "A vessel which is being overtaken"—not a vessel, the officers of which think or are convinced she is being overtaken, but "a vessel *which is being over-taken*—by another *shall show*" one of two prescribed forms of light. The fixed light shows to the extent of its power under any and all conditions; the flare-up light only when the seaman in charge thereof determines to use it. The language of the rule, under the conditions therein set forth, establishes a continuing obligation and a mandatory direction for the fulfillment thereof.

Applying these principles to the present case, the Augusta G. Hilton was actually being overtaken by the George Washington, and that fact made it obligatory upon her to display a light, if the matter of the steam-

er's position astern was in any wise made known to those aboard the Hilton. And that it was so made known all the witnesses on the subject unite in testifying. In fact, Maker, the second mate of the schooner, testified that his captain asked him from what direction the first whistle came, that he told him, and that they both stood on the quarter deck, watching and listening for her to blow again. It thus seems apparent that the circumstance of the steamer's presence astern had not only come to the knowledge of, but was in the minds of these two men; and, if credence is to be given to the testimony of Peterson, whose continued duty at the wheel aft gave him an excellent opportunity to hear whistles blowing astern, there were several blasts from the steamer's whistle, all coming from the same general direction, more than enough to put a careful mariner upon his guard. And yet, in the face of these conditions, the captain, with a flare-up light in his hand, failed to make any use of it whatever. This omission of a stern light of any sort constituted distinct negligence, and the only negligence which apparently shows in the case.

On the other hand, the George Washington, from the evidence, appears to have adopted and maintained such safety precautions as must hold her free from fault. She was in charge of officers of wide experience. On the bridge, for a long period before the collision, were the commander of the vessel, his three officers, and two quartermasters, while lookouts were posted, not only in the crow's nest, but on the forecastle, and on both wings of the bridge. The lights were those required by the law; a foremast light, a range light, and port, starboard, and stern lights. The whistle, it is testified, was blown continuously at intervals of a minute, and the speed of the steamer had been modified to two-thirds of the maximum, or 12 knots per hour, a speed at which it is claimed the vessel became most tractable and easiest to control.

From the nature of the night, as described by all the witnesses, it appears but reasonable to believe that the use of a flare-up light on the schooner would have notified the steamer of the schooner's location in plenty of time to have avoided the collision, and that the presence of the schooner was recognized by those aboard the steamer fully as soon as could in any wise be expected, allowing consideration to the fact that no light showed from the schooner's stern.

Taken together, these facts combine to show a due and careful regard for the safety of other vessels plying along the steamer's route and a completeness of execution which defeats any charge of negligence. As dealing with the subject of vessels' lights in general, as governed by the rules, the following excerpt from the opinion of the court in The Bernicia Case (D. C.) 122 F. 886, is pertinent; the facts in that case largely matching those of the present one:

"The libelant's counsel claims that under this rule an overtaken vessel has an option to use at the stern either a white light, or a flare-up light, or a fixed and screened white light, and that, if she chooses to use a flare-up light, all that is required of the overtaken vessel is that, as soon as she sees or can reasonably be expected to see the overtaking vessel, she shall show a flare-up light, if there is time to do so. It is true that under this rule the master of a vessel has an option to use either kind of light, but I think, if he chooses to use a flare-up light, instead of a screened light set at the stern, there are strong grounds for holding that he is bound to make it as efficient as the set light, and that it is no defense that he had not time to get it, light it, and show it after the overtaking vessel was seen or might have been seen. If he uses a flare-up light, of course, a lookout astern is necessary. If he uses a set screened light, no lookout astern is necessary. The set light looks out itself. Before 1885 there was no rule specifically providing for an overtaken vessel showing a stern light. The only rule that applied to such a case was that every sail vessel 'shall, on the approach of any steam vessel during the nighttime, show a lighted torch upon that point or quarter to which such steam vessel shall be approaching.' Rev. St. U. S. § 4234. In 1885 the first paragraph of the present rule was adopted. Act of March 3, 1885, art. 11, 23 Stat. 440, c. 354. It was taken from an English rule in substantially the same language. It did not provide for a fixed light, but provided that either a white light or a flare-up light should be shown from the stern when a vessel was being overtaken by another. Indeed, no rule then authorized a fixed stern light, and its use was then probably illegal. Marsden on Collisions (4th Ed.) p. 421, and cases cited. Under this rule, it was held that no duty to show a light arose till the vessel which was being overtaken had had an opportunity of seeing that the vessel which was overtaking her was a vessel coming nearer to her, and that then only the duty arose to give the specified warning within a reasonable time. The Main, 11 P. D. 132.

In 1890 the present rule was recommended by the maritime commission, and approved by Congress. Act Aug. 19, 1890, 26 Stat. 320, c. 802 (U. S. Comp. St. 1901, p. 2863). But it was not to go into effect until a time to be fixed by the President by proclamation, and such proclamation was not issued till 1896. Proc. Dec. 31, 1896, 29 Stat. 885."

While the present rule regarding overtaken vessels and their duties is of comparatively recent origin, and more rigorous than its predecessor, it is nevertheless a product born of necessity, unmistakable in its terms, and designed for widespread and impartial application. Those in charge of the Augusta G. Hilton, under circumstances which made their omission negligence, failed to obey the rules, and this failure was responsible for the collision.

Upon this ground the libel will be dismissed. And while such dismissal is dispositive of the case, so far as this court is concerned, the fact that another defense was urged in behalf of the respondent, viz. that the George Washington was not engaged in the merchant service at the time of the collision, but was owned and possessed by the United States of America, makes proper a finding by this court upon that point also, in order that all matters pertinent to the settlement of the present controversy may be brought to the attention of the appellate tribunal, should an appeal be taken, and unnecessary delay and litigation be thereby avoided.

It is conceded by respondent that the purpose of the George Washington in going to Boston was to gain the benefit of the dry dock facilities at that place, and that her docking was a move in her reconditioning for entrance into the merchant service. It was on her return voyage from Boston, en route to the yard of Tietjen & Lange, where her reconditioning was to be completed, that the collision occurred. The reconditioning was being carried on pursuant to a contract entered into during the month of May, 1920, between the United States of America, acting through the United States Shipping Board, and the United States Mail Steamship Company, Inc., whereby the United States of America agreed to charter the George Washington to the steamship company for transatlantic service when reconditioned. In fulfillment of that agreement to recondition the George Washington, she was delivered to Tietjen & Lange in April, 1921. After the Boston trip, during which the collision occurred, and on July 21, 1921,

she returned to Tietjen & Lange's yard, and her reconditioning was completed. The United States of America, acting through the Shipping Board, delivered her to the United States Mail Steamship Company, Inc., on July 28, 1921; she obtained her certificate from the local board of steamboat inspectors at New York on August 2, 1921, and sailed from New York on her first transatlantic voyage under her new management the next day, August 3, 1921.

[3] The question therefore arises as to whether or not on the trip from Boston to New York the George Washington was engaged in the merchant service. In my opinion, she had not yet entered that service. On the trip in question she was traveling light, carrying a partial crew only, and no cargo whatever. There still remained the necessity for a further reconditioning before the United States of America, acting through the Shipping Board, could either claim that it had completed its part of the contract with the steamship company or compel the steamship company to accept delivery. I am of the opinion, therefore, that at the time of the collision, the George Washington was both owned and possessed by the United States of America, and could not be considered as having entered the merchant service until she was delivered to the steamship company on July 28, 1921.

That she was employed as a merchant vessel at the time of the commencement of the present action is not to be questioned, and if that were the only matter to be determined, as a strict reading of section 2 of the Suits in Admiralty Act, approved March 9, 1920 (Comp. St. Ann. Supp. 1923, § 1251¼a), would seem to indicate, solution would seemingly be easy, although it is doubtful if the language of paragraph 2 of the libel, as filed herein, would meet the requirements laid down by the court in the case of Mack Engineering & Supply Co. v. United States (D. C.) 291 F. 713.

In view of the immunity from prosecution, as originally inherent in the United States, the sovereign power, the more important consideration to be dealt with here is as to whether or not any rights of action against the government, not theretofore existing, were brought into being through the enactment of the statutes approved respectively September 7, 1916 (39 Stat. 730) and March 9, 1920 (41 Stat. 525 [Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l]), and on this point, as well as that of her status at the time of commencing suit, the United States Supreme Court speaks as follows:

"But the Act of September 7, 1916, c. 451, § 9, does not create a liability on the part of the United States, retrospectively, where one did not exist before. Neither, in our opinion, is such a liability created by the Act of March 9, 1920, c. 95, § 4, authorizing the United States to assume the defense in suits like these. It is not required to abandon any defense that otherwise would be good. It appears to us plain that before the passage of these acts neither the United States nor the vessels in the hands of the United States were liable to be sued for these alleged maritime torts. * * * The only question really open to debate is whether a liability attached to the ships which although dormant while the United States was in possession became enforceable as soon as the vessels came into hands that could be sued. * * * The United States has not consented to be sued for torts, and therefore it cannot be said that in a legal sense the United States has been guilty of a tort. For a tort is a tort in a legal sense only because the law has made it so. If then we imagine the sovereign power announcing the system of its laws in a single voice it is hard to conceive it as declaring that while it does not recognize the possibility of its acts being a legal wrong and while its immunity from such an imputation of course extends to its property, at least when employed in carrying on the operations of the government—specifically appropriated to national objects, in the language of Buchanan v. Alexander, 4 How. 20—yet if that property passes into other hands, perhaps of an innocent purchaser, it may be seized upon a claim that had no existence before." The Western Maid, 257 U. S. 419, 42 S. Ct. 419, 66 L. Ed. 299.

From the foregoing, it is plain that unless the George Washington, at the time of the collision, had become a merchant vessel, the present suit would not properly lie; nor would the situation be altered by the fact that subsequently she was inducted into that branch of the service.

In the present case, while being refitted for entrance into the merchant service, the George Washington had not as yet emerged from the yard of her reconditioners, fit for the service, had not carried a passenger or a pound of cargo, had not been delivered to the company under whose management she was to serve as a merchant vessel, and had not received her certificate from the local board of inspectors. To my mind, these combined facts afford ample warrant for the denial that at the time of the collision she was a merchant vessel, and the United States thus subject to suit. And this view finds justification in the opinion of the court in the case of The Lake Lida, as reported in (C. C. A.) 290 F. 178, 1923 A. M. C. 792, where the court in its opinion, albeit with apparent reluctance, adopts a much more drastic interpretation of that which constitutes a steamship's status as a merchant vessel than the circumstances of the present case make necessary. The opinion, in part, is as follows:

"A . preliminary question, involving the jurisdiction of the District Court, is presented for consideration. Appellant insists that that court was without jurisdiction, since the Lake Lida was a government-owned ship, and at the time of the collision was actually engaged in the government's business of transporting coal for governmental use at its coaling station at Colon. There is much force in the contention of appellees that, inasmuch as the United States Shipping Board had been using the Lake Lida, through the instrumentality of the West India Steamship Corporation, as its agent, pursuant to the federal statute to that end, for general commercial purposes, the contract to carry a single cargo of coal from Norfolk to Colon for the government, under contract with the Navy Bureau, did not exempt the government from suit or liability because of its governmental attributes and connections. We should be strongly inclined to so hold, but for the decision of the Supreme Court of the United States in the case of The Western Maid, 257 U. S. 419, 429, 434. In that decision, the Supreme Court makes clear that neither the Act of September 7, 1916, nor that of March 9, 1920, gives any cause of action that did not theretofore exist against the government; in other words, that since the United States and its vessels were not subject to suits for admiralty torts of the kind here involved, prior to the passage of the two acts referred to, such suits cannot now be maintained, save when its ships are being used as merchant vessels. The decision in The Western Maid was followed by this court in the case of Jeannette Skinner and Ceylon Maru, 281 F. 538, as it was also by the United States District Court for the Southern District of New York in The Western Hope, a decision by Circuit Judge Ward, 1923 A. M. C. 82, 287 F. 400, and while these decisions were not brought to the attention of the trial court, we feel that they are controlling, and hence the jurisdiction should be denied.

"It is earnestly insisted that these cases do not apply under the facts here. We appreciate the strength of the view presented, but are forced to the conclusion that the case comes within the principles announced therein, and from a legal standpoint they are not distinguishable."

Therefore, upon a review of the whole matter, I am of the opinion that both by reason of the negligence of those on board the Augusta G. Hilton, and because the George Washington, at the time of the collision was not employed in the merchant service, the libel must be dismissed.