## MARTIN MARINE TRANSPORTATION CO. v. UNITED STATES.
### THE P. F. MARTIN.

### THE SOUTHERN SWORD.
### THE CONTOY.

#### No. 6093.

United States Court of Appeals
Fourth Circuit.

Argued June 28, 1950.

Decided August 10, 1950.

John W. Oast, Jr., Norfolk, Va. and Leonard J. Matteson, New York City, for appellant and cross-appellee.

J. Frank Staley, Special Assistant to the Attorney General, (H. G. Morison, Assistant Attorney General, George R. Humrickhouse, U. S. Attorney, Richmond, Va., John P. Harper, Assistant U. S. Attorney, Norfolk, Va., and John T. Casey, Attorney, Department of Justice, Washington, D. C., on brief), for appellee and cross-appellant.

Before PARKER, Chief Judge, and DOBIE, Circuit Judge, and GILLIAM, District Judge.

DOBIE, Circuit Judge.

Martin Marine Transportation Company (hereinafter called Martin) filed, in the United States District Court for the Eastern District of Virginia, two petitions for exoneration from (and/or limitation of) liability—the first as owner of the tug P. F. Martin and the second as owner of the barges Southern Sword and Contoy. These causes of action, which were consolidated below, arose out of a collision between, on the one hand, the barges Contoy and Portsmouth (which with the barge Southern Sword were in tow of the tug P. F. Martin) and on the other hand, a Government Examination Boat (Ex Diamond Shoals Lightship 105) on July 20, 1944.

The petitions of Martin were filed in response to a claim by the United States against Martin, as owner of the tug P. F. Martin and the barges Southern Sword and Contoy, for $850,000 damages for the loss of the Examination Boat. The District Judge denied the petition with respect to the tug P. F. Martin but granted the petition with respect to the barges Southern Sword and Contoy. Martin has appealed from that part of the judgment as respects the tug and the United States, as owner of the Examination Boat, has cross-appealed from that part of the judgment concerning the barges.

The Examination Boat, on July 20, 1944, was moored to a buoy at a point just north of Cape Henry, Virginia, at the entrance to Chesapeake Bay. Her function was to secure reports from all vessels entering the Virginia Capes during war time as to their identity and the port from which they had sailed and the port to which they were bound. The tug P. F. Martin and her tow were en route from the port of New York

to the port of Norfolk. The tow consisted of the barges Southern Sword, Contoy and Portsmouth, arranged in that order. Unlike the other two barges which were owned by Martin, the Portsmouth was the property of the United States.

During the evening of July 20, 1944, this flotilla reached the Virginia Capes and was advised by the Government Outer Guard Boat to shorten the hawsers between the vessels. When the hawsers had been shortened from 1,200 to 600 feet, the flotilla headed in a westerly direction so as to pass to the south of the Examination Boat. After the hawsers had been thus shortened, the length of the entire tow was still more than half a mile. When within about one-half mile of the Examination Boat, the Master of the tug decided to change his course and pass to the north of the Examination Boat because of the tide which was setting towards the North. At this time the speed of the flotilla, allowing for the force of the tide, was about four or five knots.

As the flotilla approached the Examination Boat its speed was reduced, with the result that the towing hawsers became slack and the barges lost steerage way. The tug passed within 300 to 500 feet of the Examination Boat and the required report was made orally by means of a megaphone. At that time, the tug was advised by someone on the Examination Boat that a squall was expected within half an hour. Immediately after the tug passed the Examination Boat, however, a sudden squall from the northwest struck the vessels. The Master of the tug ordered hard right rudder and the tug hauled off to the north. The Southern Sword passed within 40 or 50 feet of the Examination Boat but escaped collision. Both the Contoy and the Portsmouth, however, struck the starboard side of the Examination Boat, which sank as a result of the collision.

No negligence whatsoever on the part of the Examination Boat, an anchored vessel, contributing to the collision has been shown. Thus Martin is forced to rely on the defense of inevitable accident. In that connection we quote from The Philip J. Kenny, 3 Cir., 60 F.2d 457, 458: "It is thus obvious that, in order to sustain the defense of inevitable accident, the respondents had the burden of supporting not only their pleaded defense that the general cause of the collision was a gust of wind, but also that the gust of wind was of such unusual force as was not to be expected under the prevailing weather conditions, and that there was not any intervening act of negligence on the part of the towing vessel. The evidence falls far short of sustaining this burden of proof."

See, also, The Rob, 2 Cir., 122 F.2d 312. It is clear to us that Martin did not sustain below the burden necessary to prove an inevitable accident, and with regard to the finding of the District Court that the tug P. F. Martin was at fault we find no error.

The force of the wind in the sudden gust was not shown to be more than 25 miles an hour. Here then the words of Judge Swan, in The Rob, 122 F.2d at page 314, are worthy of note: "If a towing company insists on hauling a thousand foot tow of light barges in a section of the river where thunder squalls are usual, we think it should bear the risk of failure to supply tugs of such power and so located as to keep some reasonable measure of control of its tow in the face of a wind of only 40 miles velocity. In our opinion Cornell did not establish that the storm was of so unusual a character that a case of inevitable accident was made out. Cf. The Mary T. Tracy, 2 Cir., 8 F.2d 591, where the wind velocity reached 65 miles an hour."

The squall here struck without any timely warning of its approach, but prior to the collision the Master of the tug stated that for several hours previous to the collision he had observed "lightning in all directions, all around the horizon." He also stated that this was not heat lightning and referred to "the squalls we had been seeing all around." We believe that this fact should have been sufficient to put the Master of the tug on notice that a sudden squall might be expected at any time.

Applicable regulations in force at the time of the collision provided:

"Vessels entering from the sea, having in tow one or more barges or other vessels,

* . * * shall shorten all towing hawsers so that each vessel towed is under positive control of the towing vessel. * * *

" * * * no tow line of such length shall be used that the lowest point of the catenary of the towing lines will be at a greater depth than ten (10) feet below the surface, nor shall the speed of the towing vessel be decreased so as to permit the towing hawsers to slacken and sink to the bottom, nor shall any tow line be cast off and permitted to drag on the bottom." (Issued by Captain of Port of Norfolk, Va., September 20, 1943—Coastal Information Bulletin, dated September 30, 1944.)

The distance from the stern of the tug to the stern of the last barge in line was 2,-738 feet. Nevertheless, in spite of this unwieldly length of tow and the regulations just quoted, the tug had slowed down to such an extent that the barges no longer had the use of their rudders and were not under positive control of the tug.

Regulations effective January 1, 1940, require a proficiency in the use of signals, Morse and Semaphone, as a requirement for either an original license or raise of grade of any deck officer for any tonnage. The Second Officer of the tug obtained his deck license during the period when these regulations were in effect; yet no one on the tug could read blinker or was familiar with the Morse Code. We are in accord with the statement of the District Court in its opinion that a knowledge of the codes and blinker system "was necessary for safe navigation during the war period and on coastwise voyages." The Examination Boat attempted to communicate with the tug by blinker when the tug was several miles away, but without success. There was testimony that passing vessels usually did communicate with the Examination Boat by blinker.

By resort to blinker communication, the tug could have avoided both the necessity of slackening speed and passing so close to the Examination Boat. We think the tug was here clearly at fault, particularly in view of the then existing weather conditions and the great length of her tow.

While the blinker situation by itself is, we think, sufficient to attribute fault to the tug directly contributing to the collision, the tug was also at fault in at least two other aspects. The decision of the tug Captain to pass to the north of the Examination Boat, and his endeavor to execute this manoeuver, was, under the circumstances then existing, made too late, when the tug was too close to the Examination Boat. And an even clearer fault was the tug's slackening of speed, with an attendant loss of control over the barges in the tow, since the evidence clearly shows that the barges had lost steerageway.

We have no difficulty whatever in affrming the District Court's holding that the tug was guilty of faults directly contributing to the collision, with the attendant result that the tug must be held liable.

The decree of the District Court exonerated from liability the barges Contoy and Southern Sword. United States, by its cross-appeal, contends that this was error, and, on this point, seeks a reversal of the decree below. This contention of the United States, we think, is sound, and the decree below must be modified so as to make these two barges liable for the sinking of the Examination Boat.

The District Judge, in his opinion, stated: "On the other hand the Court does not find that the barges or the barge captains were negligent. It appears that they acted in an emergency *in extremis* and while what they did might not now prove to have been good seamanship they were acting in an emergency and under urgent conditions which did not give them an opportunity to give the same thought as they might in a more placid scene."

Finding of Fact No. 3 reads in part:

"The current 'Certificate of Inspection of the Barge Southern Sword required the vessel and her owner to carry a complement of five, consisting of a Master and three able seamen and one crewman. The Master had aboard only four, including himself and there is failure of proof that any of these men had an A.B. certificate.

"The Certificate of Inspection for the Barge Contoy required the Barge and its owner to carry a complement of five, all told, consisting of a Master, three able sea-

men and one crew member. On the voyage in question there were carried only the Master, designated as an A.B., one Hann, who is characterized as a fireman and also at times standing deck watch, and an additional crew member. There is a failure of proof that any of these two seamen had an A.B. certificate. No cook was carried, such duties being performed by the Barge's Master."

Finding of Fact No. 9 is as follows: "The crews of the barges were acting in an emergency and were not guilty of any negligence, as they did not have sufficient time to avoid the collision and the lack of full complement in their crews, if negligence, was without causal connection with the collision."

In Conclusion of Law No. 3 it is stated: " * * * but neither of the said barges (Southern Sword and Contoy) was guilty of negligence causing or contributing to cause, the sinking of the Lightship."

And the final Conclusion of Law, No. 6, reads: "The petition for exoneration as to the said barges is granted."

 In exonerating the barges Contoy and Southern Sword, the District Judge seems to have applied the rule that this undermanning of the two barges must be shown to have actually contributed to the sinking of the Lightship. This is not the correct rule. Upon such a violation of the statutory regulations, the burden is placed upon the barges to show that this *violation could not have contributed to the collision,* and not whether it did so contribute. We do not think the barges met this heavy burden.

In The Eagle Wing, D.C., 135 F. 826, at page 832, Judge Waddill stated: "The faults on the part of the Eagle Wing consist not only in error and negligence on the part of her navigators in the management and control of the vessel, but there was an initial fault, serious in its character, in that an important statutory requirement was violated in the selection of the vessel's mate. He was an unlicensed mate, employed contrary to section 4438 of the Revised Statutes, as amended by act of December 21, 1898, c. 29, 30 Stat. 764 (U.S.Comp.St.1901,

p. 3034) [46 U.S.C.A. § 224]; and, moreover, he was a person that it is highly probable would never have been licensed. The duty to observe this statute is imperative, and all must respect it, whether they approve of its wisdom or not; but that it is founded upon the highest considerations of the laws of humanity, looking to the safety of life and limb and the preservation of property, goes without saying. The failure to comply with statutory requirements and regulations has frequently received the severest condemnation of the courts, and, when such an omission is clearly established, the presumption is that it did contribute to the collision, unless the contrary is obviously apparent, and this presumption attends every fault connected with the occurrence; and a further obligation is imposed to show not only that it probably did not so contribute, but that it could not have done so. Pennsylvania v. Troop, 19 Wall. 125, 22 L.Ed. 148; Martello v. Willey, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637; The Bernicia, D.C., 122 F. 886; The Alabama [4 Cir.,] 126 F. 332, 61 C.C.A. 238."

Again, in The City of Baltimore, 4 Cir., 282 F. 490, 493, (then) Circuit Judge Waddill stated: "She was being navigated by a person without a master's license, in a busy harbor, and in open violation of the law applicable to her (Comp.St. §§ 8190, 8200 [46 U.S.C.A. §§ 224, 405]; Inspector's Rules (1916) V, § 19), and, in such circumstances, it is incumbent upon her to show, not only that the absence of a licensed master did not enter into the occurrence, but that it could not have done so."

Even stronger are the words of Circuit Judge Denman in The Denali, 9 Cir., 105 F.2d 413, at page 418: "The rule simply is that the violator is penalized with the burden of showing that the violation not only probably did not cause the accident, but that it could not have done so. *This burden it is frequently extremely difficult, if not impossible, for the violator to discharge, in the nature of things; and therein lies the true penalty imposed upon him.*"

And Judge Soper, speaking for our Court in The E. Madison Hall, 4 Cir., 140 F.2d 589, 591, thus set out the rule: "The burden

of proof, however, to establish the lack of privity or knowledge rests upon the owner seeking limitation of liability. And where the owner has privity or knowledge of some violation of the statutes affecting the navigation of the ship, it is presumed under the doctrine of The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, that the fault is at least a contributing cause to the loss; and the owner must bear the burden of showing not merely that his fault probably was not, but also that it could not have been a contributing cause of the disaster."

If ever there was a situation demanding complete compliance with statutory regulations, such a situation is clearly presented in the instant case. Here was a long tow, with the barges light, proceeding very slowly at night, in war time, through a mined area to one of the most congested roadsteads, with indications of squally weather all about.

Neither the Contoy nor the Southern Sword had any lookout forward. Such a lookout, we think, was clearly required and well might have given seasonable warning of the impending disaster. It is not improbable that lack of such lookouts was due to the undermanning of the barges. With full crews, it would indeed be difficult for the barges to justify, under the circumstances of this case, the absence of lookouts. See, The Virginia Ehrman, 97 U.S. 309, 315, 24 L.Ed. 890; The Minnie, 4 Cir., 100 F. 128, 131; The America, 2 Cir., 102 F. 767.

The testimony of Dowler, Master of the Contoy, and Fitzgerald, Master of the Southern Sword, gives scant, if any, help to the Martin Marine Transportation Company. We quote extracts from Dowler's testimony:

"Q. When did you send the man forward? A. A few minutes after he let the hawser go. I said 'Everybody go forward and stand by.'

"Q. How many minutes intervened between the time the hawser was cut and the collision? If you have a distinct recollection, tell us. A. I have no distinct recollection, but we were just drifting. Maybe five minutes at the most. Less than that.

"Q. Did you give any orders to drop the anchor at all? A. No, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Do you have any substantial recollection today as to the interval of time between the time the tug blew 'right' order until the time the hawsers were cut? A. I think it was less than five minutes. Three minutes probably.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Do you have a clear recollection today, Captain, respecting the bearing of the lightship off your bow at the time the hawser was cut? A. No, sir.

"Q. Do you have a definite recollection today of the speed you were making at the time the hawser was cut? A. We were practically stopped. We had just started ahead when the squall hit, to try to pull clear of the lightship. We didn't have enough headway for the rudders to answer.

"Q. To the right wheel? A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Did you notice whether at the time the tug hailed the lightship there was a slowing down in the speed of the tug and the tow? A. Yes, it had practically stopped.

\*　　\*　　\*　　\*　　\*　　\*

"Q. After the hawsers were cut, did the wheel have any effect? A. No, we didn't have headway enough.

"Q. How much headway must you have in order for the wheel to take effect? A. Of, a couple—three miles.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Do you have a clear recollection today, Captain, respecting the bearing of the lightship off your bow at the time the hawser was cut? A. No, sir."

Fitzgerald testified: "The only signal I heard was when the tug blowed to let go the hawser." When asked "Could you see the lights of the Lightship 105 at the time you shortened your hawsers?", he replied: "Well, I did not see them because I did not notice." When asked "What did you do as you passed the station vessel?", he stated: "We did not do anything, only kept our wheel hard to right to follow the tug around, which was pulling us."

There is no showing why, after the peril should have clearly been known, and the Contoy had lost headway, the anchor of the Contoy was not dropped or no effort was made to drop the anchor. Had this been done, the collision might well have been averted. And certainly the order to stand by was dilatorily given to those on the Contoy.

Under the record before us, we think the barges have utterly failed to meet the heavy burden placed upon them by their violation of the statutory regulations as to the manning of the barges. The barges, accordingly, must be held liable, and the owner must be denied limitation of liability.

The decree of the District Court is affirmed in so far as it holds the tug liable. The decree must be modified so as to hold the barges liable and to deny limitation of liability to the owner.

Modified and affirmed.