### THE M. P. HOWLETT.

### THE CITY OF PHILADELPHIA.

### M. P. HOWLETT, Inc., v. CHARLES WARNER CO. et al.

#### No. 4626.

Circuit Court of Appeals, Third Circuit.

April 25, 1932.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (James M. West, 3d, and Howard H. Yocum, both of Philadelphia, Pa., of counsel), for appellant.

Otto Wolff, Jr., and Acker, Manning & Brown, all of Philadelphia, Pa. (Everett H. Brown, Jr., of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

This is an appeal by M. P. Howlett, Inc., from a final decree of the District Court in a cause of collision. Under the terms of the decree, the appellant, as owner and claimant of the steam tug M. P. Howlett, and the Wilmington Steamboat Company, as owner and claimant of the steamboat City of Philadelphia, or their respective sureties, were each directed to pay one-half of the damages and costs therein awarded to the libelant, the Charles Warner Company, charterer and bailee of the barge No. 28, and owner of its cargo. We have carefully examined the testimony and the opinion of the court below, set out in full in the margin.[1]

---

[1] Kirkpatrick, District Judge.

The libelants in this cause in admiralty were the owners of a barge, the No. 28, which was sunk by colliding with the side of a draw, through which the barge was passing. The two respondents are respectively an overtaking vessel which passed through the draw ahead of the barge and the tug which had the barge in tow.

The disaster occurred at the Pennsylvania Railroad drawbridge across the Christiana river, a short distance below Wilmington, Del. The draw is opened by rotating the central part of the bridge upon a pivot located upon a rather narrow masonry abutment, built lengthwise with the channel, in the center of the stream. When the draw is opened (as it was at all times involved here), there are thus formed two passagoways like canals, each about 200 feet long and 90 feet wide, and each bounded on one side by the abutments and rotated portion of the bridge in midstream, and on the other or shore side of each by a fender or cribbing of pilings bound together by wire cable. The channel of the Christiana river from the bridge to its mouth below is about 100 feet wide.

On July 16, 1924, about 9 p. m., daylight saving time, the tug M. P. Howlett, towing three barges, the No. 22, the No. 73, and the No. 28 in the order named, was coming up stream toward the draw-

We discover no error either in its findings of fact, which are fully sustained by the evidence, or in its conclusions of law, and would be content to adopt the findings and opinion of the court below, if it were not that the appellant has raised a question upon appeal which was not passed upon by the learned judge of the District Court.

■ The contention of the appellant is that the fault charged to the Howlett was in extremis, and therefore it should not be held liable for half damages. In rule 8 of article 18 of the Inland Rules (33 USCA § 203, rule 8), set out in full in the opinion of the District Court, it is directed that, "if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four." The contention that the navigator was placed on the horns of a dilemma, and was thereby excused, under the in extremis rule, from warning the Philadelphia by the danger signal not to attempt to pass, is contrary to the testimony of Captain McMonagle, the master of the Howlett, who was sitting on the forward deck while Capt. Long, a licensed pilot employed on the tug, was at the wheel. Capt. McMonagle, who was close enough to the man at the wheel to talk to him, testified as follows:

"Q. What was the next signal blown by any of these vessels? A. One whistle from the Wilson Line.

"Q. The 'Arctic' blew two, and the next— A. Was our answer, two.

"Q. At that time, had you seen the 'City

bridge. The barges were made fast in tandem tow, close together, with only a foot or two between them, there being about 20 feet from the tug to the first barge. The length of the entire flotilla was about 450 feet, and the barges were 26 feet wide. It was beginning to get dark, and the lights on the vessels were lighted, although there was still sufficient daylight to see objects on the shore and vessels in the stream at a very considerable distance. A young flood tide was setting up stream at about 3 miles an hour. The tug and tow were making an additional mile and a half through the water.

Behind the tug and tow the passenger steamer City of Philadelphia was also approaching the bridge. She is a vessel 200 feet long and 32 feet in breadth, propeller driven, and capable of 16 knots. As she came up behind the barges, her speed varied from time to time due to frequent stopping of the engines at various points, but it may be taken that she was making from 7 to 12 miles through the water.

Above the bridge and coming down stream toward it was the ferryboat Arctic, 110 feet long and 50 feet wide.

When the Howlett was about 300 feet below the lower entrance to the draws she observed the Arctic, which was then about 1,000 feet above the bridge. The vessels exchanged two-blast signals indicating a starboard to starboard passing, which in the natural course of things would take the ferryboat through the east and the tug through the west passageway. The Howlett with her tow in line headed for the west passageway, and almost immediately received a one-blast signal from the Philadelphia indicating that vessel's desire to pass to starboard (east) of her. The Philadelphia was then about 100 feet behind the rear barge of the tow. She had not observed the ferryboat coming down stream above the bridge, and it was her intention to pass through the east passageway.

The Howlett made no reply to the Philadelphia's signal, but the latter nevertheless proceeded to pass, coming up alongside the barges on their starboard side. However, before the Philadelphia had reached the tug, the ferryboat appeared coming down stream through the east passageway of the draw. To pass the ferryboat port to port was out of the question by reason of the narrowness of the channel, and the Philadelphia therefore blew two blasts to the ferryboat, receiving two blasts in reply. The two vessels then passed starboard to starboard, at a point about 200 feet below the entrance to the draws. By reason of the tide, which was setting toward the westerly side of the channel, it appeared impossible for the Philadelphia to make the eastern draw, and as a result she rounded ahead of the tug, passing into the westerly draw just before her, at speed which I find to be about 10 miles an hour.

The Philadelphia passed ahead of the tug not more than 10 or 12 feet from her, at a point 50 or 60 feet below the end of the abutment which marks the southern entrance to the draws. The master of the tug, fearing a collision, put his helm to starboard, and then straightened up as he passed into the draw. This maneuver, combined with the commotion and wash caused by the passages of the Philadelphia through the narrow passage and the suction which followed in her wake, badly disorganized the tow. One of the lines between the last two barges, the No. 73 and the No. 28, parted. The No. 28 was carried to port and collided with the piling which formed the wall of the passage toward the western shore with sufficient force to sink her.

Upon the facts so found, both the Philadelphia and the Howlett were at fault, the Philadelphia for attempting to pass the tug and the tow without having received any reply to her passing signal, and the Howlett for failing to reply with the four-blast danger signal. This conclusion involves a construction of rule 8 of article 18 of the Inland Rules, U. S. C., title 3, § 203, rule 8 (33 USCA § 203, rule 8), which for convenience will be given here, and is as follows: "When steam vessels are running in the same direction and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

As to the Philadelphia, I have not found specifically that she was at fault for the manner in which she passed, because she was so clearly guilty of negligence in attempting to pass at all without an answer to her signal; and, even if it be assumed.

of Philadelphia' coming up? A. Not until I heard the whistle.

"Q. When you heard it, what did you say to Captain Long? A. 'Look out, Joe. He blowed one.'

"Q. Is that all you said? A. Yes." * * *

"Q. In any event, you said to him, 'Look out, Joe, he blowed one'? A. 'Look out, Joe, he blowed one'.

"Q. What was the 'Look out' for? A. To prepare himself for this boat to pass him in such a tight cramp.

"Q. Did Captain Long blow anything to the 'City of Philadelphia' in response to that signal? A. No.

"Q. Of course, there is no doubt that one whistle meant that she was going to pass you from the starboard? A. Yes.

"Q. Did you think, from what you could observe, that it would have been safe for the 'Philadelphia' to pass you? A. I didn't think. I knew it wouldn't.

"Q. If you had been in the pilot house, and knew that it would not have been safe for the 'Philadelphia' to pass you, what would you have done? A. Blown the danger signal."

The testimony of Capt. Long clearly indicates that he was ignorant of the obligation which the rule imposed upon him. He testified as follows:

"Q. Why didn't you answer the 'Philadelphia' signal? A. Why did I not?

(as is probable) that the appearance of the ferryboat coming out of the eastern draw after the Philadelphia was committed to the passing placed her in a position where there was nothing for her to do but enter the western draw ahead of the tug, still, the whole situation arose from her plain disregard of the requirements of the rule. Even if she had received an answering signal, it is doubtful, under the rule of The Gulftrade Case, 278 U. S. 85, 49 S. Ct. 45, 73 L. Ed. 195, whether she would have been entirely relieved from responsibility, because of the ever present risk of a vessel, not theretofore seen, coming through the eastern draw and blocking her passage in that direction. However, as the case stands, there is no doubt about her fault.

An examination of the Howlett's conduct involves first the question whether rule 8 requires an answer of some kind to a passing signal. On this point I am entirely in accord with the construction given the rule in The Mesaba (D. C.) 111 F. 215, namely, that it requires that the vessel ahead shall always answer an overtaking vessel that signals her desire to pass.

In addition to the obvious general intention of the whole rule that some reply shall be given, there is the specific requirement that, "if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point," she shall give the danger signal. The situation at the time the Philadelphia blew her passing signal definitely called for the four-blast signal from the Howlett. The Howlett had already exchanged signals with the Arctic, and knew that that vessel almost necessarily would pass through the eastern passage of the draw. That meant that, if the Philadelphia were to pass, she probably would be compelled to take the western draw. Bearing in mind that it was growing dark, and as the master of the Howlett testified it was "pretty hard for a man to judge his distance or anything like that," it is also plain that the Howlett knew much better than the Philadelphia how close to the draw she herself was. Here were two elements of grave danger in the situation which the Howlett knew perfectly well, and which the Philadelphia might or might not have known also. The master of the Howlett (who was not actually in charge at the time, but who was on deck) called the attention of the navigator to the whistle blast from the Philadelphia. He was asked: "Did you think, from what you could observe, that it would have been safe for the Philadelphia to pass you?" and replied: "I didn't think. I knew it wouldn't." He further said that, if he had been in the pilot house, he would have blown the danger signal. The navigator of the tug shows an entirely erroneous idea of the duties of an overtaken vessel

under the rule. He testified: "If that man's intentions was to come by me and I didn't answer his whistles, he should have blowed again, and then if I shouldn't answer that whistle, he should give me the danger signals—give me attention signals, not danger signals, but attention signals;" and he further said he did not think it was dangerous for the Philadelphia to pass "because the Philadelphia had a right to go on the starboard draw." However, this last statement must be taken in connection with the fact that he had already exchanged signals with the ferryboat, and he had every reason to believe that she would occupy the starboard draw before the Philadelphia could enter.

The passing signal from an overtaking vessel is not solely a request for permission to pass. It also asks for information which the overtaking vessel is entitled to have. When the overtaken vessel knows of conditions which may make the passing unsafe, it has no right to refuse to inform the overtaking vessel of such conditions, and, if it does refuse, it cannot throw the entire blame for an accident upon the other vessel.

It is almost certain that, if the Howlett had blown the danger signal as the rule and as the situation required, the Philadelphia would not have attempted to pass, and there would have been no accident. The Howlett was acting in clear disregard of a rule of navigation, and it cannot be said that such fault did not in any way contribute to the accident.

In order to define the issues I make the following specific findings in addition to the facts already stated: (1) The primary cause of the sinking of the barge was the commotion set up in the waters of the draw caused by the passing of the Philadelphia. (2) A secondary cause was the sudden deviation from her course caused by the Howlett's starboarding her helm and straightening up again. This particular maneuver, however, was not negligent on the part of the Howlett, but was an emergency measure to avoid what appeared to be a reasonable probability of collision with the Philadelphia. (3) When the Philadelphia blew its passing signal, the Howlett knew of the existence of conditions which made it unsafe for the Philadelphia to attempt to pass at that point. (4) After having committed herself to the passing, the Philadelphia was not negligent or at fault in the manner of passing. (5) The Philadelphia was at fault in attempting to pass the tug and tow without having received an answer to her passing signal. (6) The Howlett was at fault in failing to blow the danger signals immediately upon hearing the one-blast signal from the Philadelphia.

A decree may be submitted in accordance with the foregoing findings.

"Q. Yes. A. Well, I was approaching a draw, and all I had to do was to look out for my tow.

"Q. Why? A. Because I didn't answer his whistle. If that man's intentions was to come by me and I didn't answer his whistles, he should have blowed again, and then if I shouldn't answer that whistle, he should give me the danger signals—give me attention signals, not danger signals, but attention signals.

"Q. Did you think it was dangerous for the 'Philadelphia' to pass you? A. No, because the 'Philadelphia' had a right to go on the starboard draw."

It had already been settled through signals exchanged between the Howlett and the Arctic that they would pass starboard to starboard. Capt. Long, therefore, knew that the Arctic would pass through the starboard draw. If he had paid attention to Capt. Mc-Monagle's warning: "Look out, Joe, he blowed one," and had known and obeyed the pilot rules, he would have done what it was his duty to do under the circumstances; that is, have blown the danger signal. His failure to do so was a positive breach of the statutory navigation rule, and a presumption is therefore established that the fault was a contributing cause of the disaster. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218; The Martello, 153 U. S. 64, 14 S. Ct. 723, 38 L. Ed. 637.

The decree is affirmed.