329 F.2d 35
 John H. ROWE, Jr., individually and as Administrator of the Estate of Larry Mitchell Rowe, deceased, Jerry Rowe, and Lloyd G. Rowe, Appellants and Cross-Appellees, and Appellees,
v.
Miles S. BROOKS and Frank Carr, trading as Williamsburg Sporting Goods and Hobby Shop, Appellees and Cross-Appellants, and
Dallas Eugene Hodge, an infant, and William E. Hodge, individually and trading as Powhatan Marina, Appellants.
 No. 9206.
 United States Court of Appeals Fourth Circuit.
 Argued January 16, 1964.
 Decided March 16, 1964.
 
 Sidney H. Kelsey, Norfolk, Va., for appellants and cross-appellees, and appellees.
 Guilford D. Ware, Norfolk, Va., for Frank Carr.
 David Nelson Sutton, West Point, Va., for Miles S. Brooks (Walkley E. Johnson, Jr., Baird, Crenshaw & Ware, Norfolk, Va., and Sutton & Causey, West Point, Va., on brief), for appellees and cross appellants.
 Leonard B. Sachs and H. Lee Kanter, Norfolk, Va. (Kanter, Kanter & Sachs, Norfolk, Va., on brief), for appellants.
 Before SOBELOFF, Chief Judge. BRYAN, Circuit Judge, and BARKSDALE, District Judge.
 
 
 1
 BARKSDALE, District Judge.
 
 
 2
 John H. Rowe, Jr., Administrator of the estate of Larry M. Rowe, deceased, and in his own right, Jerry Rowe, an infant who sued through his father and next friend, John H. Rowe, Jr., and Lloyd G. Rowe, filed their libel in admiralty against Dallas E. Hodge, an infant, William E. Hodge, individually and trading as Powhatan Marina, Miles S. Brooks and Frank Carr, trading as Williamsburg Sporting Goods and Hobby Shop, and Ellen C. Burkhardt (now Mrs. Charles G. Rosson), and Charles G. Rosson, alleging damages for personal injuries and death as the result of a collision of two motorboats, in one of which the Rowes were passengers, on July 3, 1960, in the waters of Powhatan Creek which empties into the James River near Williamsburg, Virginia. The libel alleged that the Rowes were passengers in a sixteen-foot Glaspar fiberglass boat operated by Dallas Hodge, fourteen years of age at the time, and that the Glaspar boat was owned by Brooks and Carr, trading as Williamsburg Sporting Goods and Hobby Shop, who had placed it at the Powhatan Marina for demonstration and sale in furtherance of the interests of Brooks, Carr and Hodge, unrestricted use and operation of the boat at the Marina being allowed by Brooks and Carr. The libel further stated that Mrs. Burkhardt, now Rosson, was the operator of the other boat involved in the collision, which was owned by her now husband, Rosson, who was in the boat with her at the time of the collision. It was further alleged that the death of Larry Rowe, a child of seven years, the serious injury to Jerry Rowe, eleven years of age, and the serious injuries to Lloyd Rowe, were caused solely by the joint and several negligence and wrongdoing of the owners and operators of the two motorboats.
 
 
 3
 The libel was brought pursuant to the General Admiralty Law of the United States and as applying the Virginia Death by Wrongful Act Statute in the case of the deceased child Larry Rowe. The Rossons filed their answer to the libel, denying liability, as did William and Dallas Hodge. Brooks and Carr did not answer the libel, but filed their petition for exoneration from, or limitation of, liability under 46 U.S.C.A. § 183. The Rowes filed their claims in the limitations proceedings, as well as answers and exceptions. The District Court consolidated for trial the exoneration from or limitation of liability proceedings with the suit for personal injuries and death, heard the evidence ore tenus, made findings of fact and conclusions of law, and rendered separate judgments in favor of the Rowes, against Dallas E. Hodge, William E. Hodge, Mr. and Mrs. Charles G. Rosson, Brooks, and Carr, aggregating $93,250.00, refused to exonerate Brooks and Carr, owners of the Glaspar motorboat, but granted them limitation of their liability to $600.00, the stipulated value of their wrecked motorboat.
 
 
 4
 The Rowes have prosecuted this appeal solely from the action of the District Court in limiting the liability of Brooks and Carr. Mr. and Mrs. Charles G. Rosson have not appealed. Brooks, Carr, William E. Hodge, and Dallas Hodge, have appealed from the rendition of judgments against them.
 
 
 5
 The evidence and admissions establish that Brooks and Carr, trading as the Williamsburg Sporting Goods and Hobby Shop, owned, and had for sale, the Glaspar fiberglass motorboat, two and one-half inches less than sixteen feet long, equipped with a seventy-five horsepower outboard motor. Brooks and Carr, pursuant to an oral agreement with William E. Hodge, owner of the Powhatan Marina, placed this boat at the Marina about two weeks prior to the accident, for demonstration and sale. It was understood between them that Hodge was to use the boat as if it were his own, and there was no limitation on its use. Brooks and Carr knew that Dallas Hodge would operate their Glaspar boat. In fact, Brooks saw him operating the Glaspar boat the afternoon before the accident. It was agreed that Hodge would receive a commission on the sale of this boat, as well as on other equipment placed by them at his Marina, and Brooks and Carr would profit also. Brooks and Carr could have removed the Glaspar boat at any time. Neither Mr. Hodge, nor his son Dallas Hodge, then fourteen years of age, had a license to operate a motorboat. However, Dallas Hodge had been operating motorboats similar to the Glaspar boat for about three years prior to the accident, and other boats when even younger. John Rowe kept his own boat at the Powhatan Marina, and, with his brother Lloyd, was interested in buying the Glaspar boat, which interest he had on previous occasions expressed to Mr. Hodge. On July 3, 1960, between 6:00 and 6:30 o'clock, P.M., John Rowe, who was at the Marina with his brother Lloyd and other members of his family, being interested in a demonstration of the boat and having the channel marked for him, requested William Hodge to take him out in the boat to mark the channel of the river. William Hodge directed his son Dallas to take the Rowes out in the Glaspar boat, and accordingly Dallas took Lloyd Rowe, John Rowe, Larry Rowe and Jerry Rowe aboard the Glaspar boat. John Rowe sat in front with Hodge, and the other three sat in the back seat. The purpose of the trip was to mark the channel of the creek for John Rowe and to demonstrate the boat in the hope of selling it to him. It was the intention of John Rowe to make up his mind that very day after the demonstration whether to buy the boat or not. Before the accident he inquired of Dallas Hodge about the price and performance of the boat.
 
 
 6
 About the same time, an unnamed, unmarked plyboard motorboat was coming up Powhatan Creek toward the Marina. Mrs. C. G. Rosson (then Mrs. Burkhardt), was operating that boat with the owner Charles G. Rosson aboard. Powhatan Creek flows on a winding course into the James River about a mile from the Marina. The creek varies in width from 100 to 200 feet. At the place of collision it was between 100 and 125 feet wide, and the channel was about 90 feet in width, with a depth of 4 to 6 feet at high tide. The accident occurred approximately one-fourth of a mile from the Marina in the direction of James River in a straight stretch of the creek between two bends. The area was marshy with trees and high swamp grass on both sides of the creek which interfered with visibility around the bends.
 
 
 7
 Dallas Hodge left the Marina, heading toward the James. After traveling a distance of 100 feet from the Marina, he accelerated to a speed of from 15 to 20 miles an hour. At this speed the boat planed. He reduced throttle in order to navigate the bends but increased throttle on the straightaways. Dallas reduced throttle in rounding the fourth bend, which was to him a left hand bend. While he was coming around this bend, he noticed the Rosson boat rounding the next bend about 400 feet away, heading in his direction on his side of the creek. When Dallas completed the bend, he increased throttle even though the Rosson boat continued on his side of the creek heading directly toward him. His speed at this time was between 15 and 20 miles per hour and the boat was planing. He moved further to his right, but the Rosson boat also moved to its left, continuing to head toward the Hodge boat. Dallas moved to within five feet of the right bank, but did not decrease his speed. He did not believe he was in danger until the two boats were about 50 to 75 feet apart. At that point Dallas turned diagonally to his left without giving any signal. At the same time Mrs. Rosson turned to her right without giving any signal. The Rosson boat struck the right side and sliced into the Hodge boat at a 45-degree angle at a point just behind the front seat of the Hodge boat. The Rosson boat then slid back and struck the three occupants in the back seat, Larry Mitchell Rowe, Jerry Rowe and Lloyd G. Rowe. The collision occurred in midstream approximately equidistant between the two bends. Mrs. Rosson had operated the Rosson boat for more than a year, but on the day in question, while not intoxicated, she had been drinking alcoholic beverages.
 
 
 8
 As the direct result of the collision, Larry Mitchell Rowe, seven years of age, was killed, and Lloyd G. Rowe and Jerry Rowe sustained serious and permanent injuries. No exception has been taken by any party to the amount of damages awarded to the libellants.
 
 
 9
 Upon the facts found, the District Court concluded that Dallas Hodge was negligent in running at a high speed notwithstanding that another boat was heading directly toward his boat and that a collision was impending, and that such negligence was a proximate cause of the accident. Since Dallas Hodge was an employee of his father, and acting within the scope of his employment at the time of the collision, the District Court concluded that William Hodge was also liable. The District Court also concluded that Mrs. Rosson was negligent in operating her boat on the wrong side of the creek in violation of the Inland Water Rule and failing to move to her proper side of the creek before the collision, and that such negligence was also a proximate cause of the accident. C. G. Rosson was also held liable, since he was the owner and master of the boat, aboard at the time of the collision, and in the exercise of reasonable care he saw, or should have seen, that Mrs. Rosson, to whom he had entrusted the operation of the boat, was on the wrong side of the channel, in ample time to have ordered her to change her course. The District Court further concluded that neither Dallas Hodge nor Mrs. Rosson was entitled to rely upon the doctrine of error in extremis, because both were at fault in bringing about the situation which placed them in extremis.
 
 
 10
 It seems so obvious that the District Court was correct in its conclusion that the collision resulted from the concurring negligence of Dallas Hodge and Mrs. Rosson, no discussion seems necessary or desirable. The case of A. H. Bull S. S. Co. v. Chesapeake S. S. Co. (4th Cir. 1939), 101 F.2d 599, definitely supports this conclusion. See also Bindloss v. The Blue Fin, D.C., 137 F.Supp. 827, American-Hawaiian S. S. Co. v. Western Transportation Co. (9th Cir. 1943), 139 F.2d 478, and Morrow S. S. Co. v. The Daniel J. Morrell, D.C., 90 F.Supp. 300. As supporting the conclusion that neither operator could rely on the doctrine of error in extremis, see The M. P. Howlett (3rd Cir. 1932), 58 F.2d 923, The Manchioneal, 2 Cir., 243 F. 801, 805.
 
 
 11
 Although the District Court limited the liability of Brooks and Carr, it held that they were not entitled to exoneration, presumably upon the theory that Dallas Hodge was their agent. The District Court concluded that the arrangement entered into between the partnership of Brooks and Carr and William E. Hodge did not constitute a joint venture.
 
 
 12
 We agree with the District Court in its conclusion that Brooks and Carr were not entitled to exoneration from liability: however, we think the court erred in its conclusion that there was no joint venture. We hold that the arrangement entered into verbally by William Hodge and Brooks and Carr that the Glaspar boat (and other equipment), the property of Brooks and Carr, should be placed at the Marina of William Hodge for demonstration and sale by Hodge for the mutual advantage and profit of Hodge and the partnership of Brooks and Carr, each to have a measure of control, constituted a joint venture, imposing responsibility on both of the joint adventurers for liability incurred within the scope of the enterprise. There can be no question that the liability for the payment of the judgments rendered against William Hodge in this action, was incurred by him within the scope of the enterprise. This is an even stronger reason than that apparently relied upon by the Court for refusing exoneration to Brooks and Carr.
 
 
 13
 There seems to be ample authority for our conclusion that this arrangement did constitute a joint venture. In Wiley N. Jackson Co. et al. v. City of Norfolk, 197 Va. 62, 87 S.E.2d 781, the Commonwealth of Virginia, acting through its State Highway Commission, the City of Norfolk, and the Norfolk & Western Railway, agreed to construct an underpass in Norfolk eliminating a railway grade crossing. In their agreement each party agreed to perform some specific undertaking toward the completion of the project, the ultimate cost of the project to be shared equally. In holding that this arrangement constituted a joint venture, the court said (87 S.E.2d pp. 784, 785):
 
 
 14
 "In entering into the tri-party contract of July 15, 1949, the parties combined their efforts and resources for a common purpose, the removal of a hazardous grade crossing, a joint undertaking of a business nature for their mutual gain and benefit. They were thus agreeing to participate in a joint adventure, which is a special combination of two or more persons, where in some specific undertaking of a business nature a profit or other gain or benefit is jointly sought without any actual partnership or corporate designation. E. g., Jones and Galleher & Co., 187 Va. 602, 47 S.E.2d 333; Horne v. Holley, 167 Va. 234, 188 S.E. 169. See 36 Va.L.Rev. 425 for an exhaustive discussion of this subject."
 
 
 15
 In Tompkins v. Commissioner (4th Cir. 1938), 97 F.2d 396, a partnership and a corporation entered into an agreement to purchase real estate in the City of Washington in the hope of selling it at a profit. In holding that this arrangement constituted a joint venture, the court said (97 F.2d p. 398):
 
 
 16
 "We think the circumstances disclosed by the evidence show that this was a joint venture between the Partnership and the Corporation for the purpose of profit. The nature and purpose of the business in which petitioners, the partnership, were engaged generally; the absence of any interest by the partnership or any of its members in the corporation and of any showing or suggestion that the corporation or any of its officers or stockholders were interested in the partnership; the well known object of a real estate corporation such as McPherson Square Corporation, all of the stock in which was owned by a brokerage company; the fact that this was the only transaction ever entered into between the partnership and the corporation and the nature of the transaction itself, in the absence of affirmative proof to the contrary, justify the conclusion that the object of the purchase and holding of the property by the partnership and the corporation constituted a single special joint adventure the purpose of which was profit. In Dexter & Carpenter v. Houston, 4 Cir. 1927, 20 F.2d 647, at pages 651, 652, it was said:
 
 
 17
 "`A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." * * * It is purely the creature of our American courts.' 33 C.J. 841. A joint adventure has also been termed `commercial enterprise by several persons jointly'. Joring v. Harriss (C.C.A.) 292 F. 974."
 
 
 18
 In Aiken Mills v. United States, et al. (4th Cir. 1944), 144 F.2d 23, two corporations operating cotton mills entered into a contract with a third corporation, and it was agreed that the mill operators "will manufacture goods and will sell and deliver the same" to the third corporation, which would sell the entire output, and that profit and losses resulting from the sale of the goods would be divided between the three. As to what relationship between the three parties this contract created, the court said (144 F.2d pp. 24, 25):
 
 
 19
 "The judge below reached the conclusion in his opinion that, under the agreement between the mills and Seneca, Seneca was not a customer of the mills but that the mills and Seneca were joint venturers in a transaction. It is our opinion that the judge below reached the right conclusion. Seneca was clearly not a customer in the commonly accepted meaning of that word and, in the event that losses occurred from the joint operation under the contract, the mills would receive no charge or fee. In Dexter & Carpenter v. Houston, 4 Cir., 20 F.2d 647, 651, we discussed the question of joint adventures, where we said:
 
 
 20
 "`A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without an actual partnership or corporate designation". * * * It is purely the creature of our American courts.' 33 C.J. 841. A joint adventure has also been termed `commercial enterprise by several persons jointly.' Joring v. Harriss, 2 Cir., 292 F. 974."
 
 
 21
 "Joint Ventures" is the subject of an exhaustive article in 36 Virginia Law Review 425. Therein it is said (p. 430):
 
 
 22
 "The joint venture, also known as joint adventure, joint enterprise, joint undertaking, joint speculation and syndicate, has been defined as a special combination of two or more persons who, in some specific venture, seek a profit jointly without any actual partnership or corporate designation. While this definition has achieved some acceptance, it should be repeated that the courts have not yet laid down any very definite boundaries for a joint venture. In view of the decisions, the term is one of variable meaning, and it is one that has evaded precise definition. `Although the legal significance of joint adventure has come to be widely recognized, it was unknown to the common law, and does not readily admit of short and satisfactory definition.' `It is impossible to define the relationship of joint adventure with exactitude and precision.' Rowley declares that a joint venture may be defined as `an association of two or more persons to carry out a single business enterprise for profit.' Though incomplete, this definition has been accorded wide recognition. Black defines a joint venture as a `commercial or maritime enterprise undertaken by several persons jointly; a limited partnership, — not limited in the statutory sense as to the liability of the partners, but as to its scope and duration.'"
 
 
 23
 Although refusing to exonerate them, the District Court limited the liability of Brooks and Carr to $600.00, the stipulated value of the motorboat. The Limitation Statute, 46 U.S.C.A. § 183, so far as pertinent, is as follows:
 
 
 24
 "The liability of the owner of any vessel, * * * for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, * * * exceed the amount or value of the interest of such owner in such vessel, * * *."
 
 
 25
 The District Court found that Dallas Hodge was a competent operator, that the boat was seaworthy, and concluded that the negligence of Dallas Hodge was without the privity and knowledge of Brooks and Carr, and that therefore they were entitled to limit their liability to the value of the motorboat. With this we disagree, because we are definitely of the opinion, as will presently appear, that the Rowes were passengers for hire, that in taking them out in the boat for the purpose of demonstrating it for sale, Dallas Hodge, under the law, was required to have a license, and since he did not have a license, the boat was unseaworthy which was known or should have been known to Brooks and Carr.
 
 
 26
 Title 46, Code of Federal Regulations, Section 24.01-1, et seq., the Regulations necessary to carry out the provisions of the Federal Motorboat Act of 1940 as amended, 46 U.S.C.A. § 526 et seq. has the force of law. Title 46, C.F.R., 24.10-3 defines the carrier of passengers for hire as follows:
 
 
 27
 "Sec. 24.10-3. Carrying passengers for hire. The carriage of any person or persons by a vessel for a valuable consideration, whether directly or indirectly flowing to the owner, charterer, operator, agent or any other person interested in the vehicle."
 
 
 28
 Title 46, C.F.R. 157.30-30, so far as pertinent, provides that —
 
 
 29
 "Every motor boat * * * while carrying passengers for hire, shall be operated or navigated by a person duly licensed for such service by the Coast Guard. * * *"
 
 
 30
 Title 46, C.F.R. 10.20 sets forth the requirements for the issuance of motorboat operators' licenses, among them being that the person to be licensed must be eighteen years of age, stand an examination as to his knowledge of the navigation rules, including the collision regulations applicable to the waters over which the applicant will operate. Not only did Dallas Hodge not have a motorboat operator's license, but it is obvious that he could not have obtained one.
 
 
 31
 It is to be noted that, in the above definition of "Carrying passengers for hire", there is no requirement that the "hire" be a money consideration. It is sufficient to render the persons being carried by a vessel "passengers for hire", if their carriage is "for a valuable consideration, whether directly or indirectly flowing to the owner, * * *". We find no case, nor has any been cited to us, on the precise question here presented, but in automobile law there are numerous cases on the question of whether persons being carried in the automobile of another are "guests" or "passengers for hire". A statement of the general principles applicable to this question appears in 5A Am. Jur., Sec. 520, p. 559, as follows:
 
 
 32
 Sec. 520. — Incidental Business Benefit. — Payment for transportation need not be made in money; it is sufficient that the owner or operator is compensated in a substantial or business sense as distinguished from mere social benefit or normal or incidental contribution to expenses. Payment may be an anticipated or prospective profit, or any return making it worthwhile to furnish the ride. The guest statute was not intended to deny a right of action for injuries suffered through negligence of the owner or operator of an automobile by one who is being transported for the benefit of the owner or operator, or for the benefit of both the passenger and the owner or operator. * * *
 
 
 33
 "A prospective buyer of an automobile, who, at the invitation of a dealer, is riding therein for the sole purpose of ascertaining whether it complies with his requirements, or a prospective purchaser of real estate who, at the invitation of a real estate company, is riding in an automobile hired by it and used to carry prospective purchasers to and from the tract, is not a guest within the meaning of such statute. * * *."
 
 
 34
 In the case of Bookhart v. Greenlease-Lied Co., 215 Iowa 8, 244 N.W. 721, 82 A.L.R. 1359, the court held that a prospective buyer of an automobile, who, at the invitation of the salesman, accepts a ride therein for the sole purpose of ascertaining whether it complies with his requirements, is a "passenger for hire" and not a "guest". In its opinion, the court cited with approval the case of Crawford v. Foster, 110 Cal.App. 81, 293 P. 841, which held that a person riding in an automobile being demonstrated to him as a prospective purchaser by a salesman, was not a "guest" within the meaning of the California statute, but was rendering value for his transportation. The California court said (82 A.L.R. 1363):
 
 
 35
 "`Automobile dealers and salesmen are not only willing but anxious to exchange their time and the use of a car for the time and attention of a person who is in the market for such a car. There can be no question that in actual business the one is regarded as an equivalent or recompense for the other. * * * The taking of a demonstration of an automobile, with its accompanying possibilities of profit, would not only seem to be a benefit to the dealer, but a return fully proportionate to any benefit conferred on the prospect. * * * And, further, that one who is looking at an automobile with a view of purchasing the same, and who accepts a ride therein as a part of the examination thereof, solely to test its fitness for his use, is not accepting a ride as a matter of hospitality, but is rendering value received for his transportation' * *."
 
 
 36
 In Poole v. Kelly, 162 Va. 279, 173 S.E. 537, defendant Poole took plaintiff Kelly, a possible purchaser, to look at a house in the town of Crewe, which Poole had for sale and in which he was interested. While on this trip, there was an accident resulting in the death of Kelly, and his administratrix sued Poole for damages. The case was tried on the theory that Kelly was a guest and proof of gross negligence was required to justify a verdict for the plaintiff. There was a verdict for the plaintiff, which was affirmed on appeal, the Supreme Court being of opinion that the evidence amply justified the jury's findings of gross negligence. At the conclusion of the opinion, the court said:
 
 
 37
 "It was urged in argument that Kelly was not a guest, or at least not a guest who came within the doctrine of Boggs v. Plybon [157 Va. 30, 160 S.E. 77], but that Poole was attempting to please a possible purchaser of property in which he was interested. This case was tried upon the theory that this doctrine did apply, and, since we have reached the conclusion that under it a recovery must be sustained, it is not necessary to determine the plaintiff's rights under a less stringent standard. In other circumstances this might be an important question.
 
 
 38
 "Whenever transportation is for the pecuniary benefit of the defendant, this fact, when established, takes the case out of the category of gratuitous transactions. Foley v. McDonald (Mass) [283 Mass. 96], 185 N.E. 926."
 
 
 39
 In Dickerson v. Miller, 196 Va. 659, 85 S.E.2d 275, it appeared that the manager of a restaurant asked two waitresses to stay after closing time and help clean up, telling them that, if they would stay, he would take them home in his automobile. They did stay, helped clean up, and the manager took them in his automobile and started on his way to their homes. On the way, the automobile collided with an electric light pole which resulted in the death of one waitress. The court held that she was a paying passenger and not a guest. In its opinion, the court said (85 S.E.2d 277):
 
 
 40
 "In considering whether a person is a paying passenger or guest passenger, the courts of the several states which have statutes similar to this section of our Code, are in general agreement as to the principles to be applied. See 5 Am.Jur., Automobiles § 239, p. 634. With respect to `payment' it is not necessary that the operator of the vehicle receive actual cash in return for the transportation supplied, since services or other benefits given by the occupant, if regarded by the parties as consideration inducing the offer of transportation, may be sufficient to entitle the occupant to the status of a paying passenger * * *. See, for example, Hayes v. Brower, 39 Wash.2d 372, 235 P.2d 482, 25 A.L.R. 2d 1431; Wilcox v. Keeley, 336 Mich. 237, 57 N.W.2d 514; 10 A.L. R.2d 1361.
 
 
 41
 "Before and since the passage of our guest statute it was recognized that payment in cash was not necessary to change the status of an occupant of an automobile from guest passenger to paying passenger; services rendered or to be rendered were sufficient. See White v. Gregory, 161 Va. 414, 170 S.E. 739; Brown v. Branch, 175 Va. 382, 9 S.E.2d 285; Miller v. Ellis, 188 Va. 207, 49 S.E.2d 273."
 
 
 42
 In Richardson v. Charles, 201 Va. 426, 111 S.E.2d 401, plaintiff Charles bought a used car on December 7, 1958, from Richardson, a used car salesman for a motor company in Portsmouth, Virginia. It was agreed that the car was to be painted and delivered to Charles on Monday morning, December 9, 1958. On that day, Charles called twice for delivery of his car, and was informed that it was not ready, but would be ready the following morning. He returned the following morning, and was again advised by Richardson that the car was not ready. Charles told Richardson he needed the car to go to Virginia Beach to see about a job that day. Richardson replied that he was sorry the car was not ready, but that he would take Charles to Virginia Beach in another car. On the trip, there was an accident, and Charles was injured. The court held that Charles was not a guest, but a passenger, citing 5 Am.Jur., p. 59, quoting from Dickerson v. Miller, supra, 196 Va. 659, 85 S.E.2d 275, and said (111 S.E.2d 404):
 
 
 43
 "In the present case the evidence shows that the trip from Portsmouth to Virginia Beach and return was motivated by the business transaction between plaintiff and defendant. Had it not been for the purchase and sale of the automobile which was not delivered to plaintiff as promised on Monday and then again on Tuesday, plaintiff would not have been a passenger in defendant's vehicle. Defendant knew that plaintiff desired delivery of the vehicle so that he could drive to Virginia Beach with reference to securing employment. Certainly this was an important mission. Defendant had defaulted in his obligation and it was a substantial benefit to him as well as his employer to furnish transportation to plaintiff in order to have a satisfied customer and to meet an obligation he recognized. The purpose of the trip was purely business and the fact that they had a social drink and dined together during the course of the trip does not change the complexion of it. The trial court properly ruled as a matter of law that plaintiff was a passenger and not a guest in defendant's automobile at the time of the accident."
 
 
 44
 We think the authorities cited above are quite analogous to the situation here presented, and it is our conclusion that, at the time of the collision, the Rowes were passengers for hire on the Glaspar motorboat, and that Title 46 C.F.R., 157.30-30, required that the Glaspar motorboat be operated "by a person duly licensed for such service by the Coast Guard." Dallas Hodge was not, nor could he have been, licensed by the Coast Guard as a motorboat operator. Consequently, the motorboat was not seaworthy. Under these circumstances, the liability of Brooks and Carr should not have been limited, and we hold that the action of the District Court in limiting their liability to the value of the motor boat was erroneous.
 
 
 45
 Brooks and Carr knew that either William E. Hodge, or his son Dallas Hodge, would operate their motorboat, and certainly knew that they would demonstrate it to prospective purchasers, because an ultimate sale was the sole purpose of placing the boat at the Powhatan Marina. Neither William E. Hodge, nor Dallas Hodge, was a licensed operator.
 
 
 46
 It is inferable from the testimony of Mr. Brooks that he knew that neither William E. Hodge nor Dallas Hodge was a licensed operator of motorboats. He testified that he thought the issuing of licenses was a matter of state law, and that "they were not issuing licenses at the time". He was not familiar with the Coast Guard requirements. He had not taken the trouble to ascertain whether the Hodges were required to have licenses. Consequently, it cannot be said that the operation of their motorboat by an unlicensed operator, thus rendering it unseaworthy, was "without the privity or knowledge" of Brooks and Carr.
 
 
 47
 In The E. Madison Hall (4th Cir.), 140 F.2d 589, the ship sailed without the proper complement, with the knowledge and consent of her owner. She collided with a wreck, and both she and her cargo became a total loss. A libel was filed for cargo damage against the ship and her owner, and the owner filed a petition for limitation of liability. In holding that the District Court properly denied the petition for limitation, this court said (140 F.2d p. 591):
 
 
 48
 "The burden of proof, however, to establish lack of privity or knowledge rests upon the owner seeking limitation of liability. And where the owner has privity or knowledge of some violation of the statutes affecting the navigation of the ship, it is presumed under the doctrine of The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, that the fault is at least a contributing cause to the loss; and the owner must bear the burden of showing not merely that his fault probably was not, but also that it could not have been a contributing cause of the disaster. The New York Marine No. 10, 2 Cir., 109 F.2d 564, 566; The Denali, 9 Cir., 105 F.2d 413, 420. This burden has not been borne by the owner in the pending case and the decree of the District Court must therefore be affirmed."
 
 
 49
 In Martin Marine Transportation Co. v. United States, (4th Cir. 1950), 183 F.2d 676, the owner of a tug and two barges petitioned for exoneration, or limitation of damages, resulting from a collision between this flotilla and an Examination Boat, the property of the United States. The District Court denied the petition as to the tug, but granted the petition of the barges for exoneration. Admittedly, the barges were undermanned in violation of statutory regulations. Upon appeal, this court affirmed the District Court insofar as it held the tug liable, but reversed the District Court's exoneration as to the barges, and held that the barges, were liable and that their owner was not entitled to limitation of liability. The court said (183 F.2d p. 680):
 
 
 50
 "In exonerating the barges Contoy and Southern Sword, the District Judge seems to have applied the rule that this undermanning of the two barges must be shown to have actually contributed to the sinking of the Lightship. This is not the correct rule. Upon such a violation of the statutory regulations, the burden is placed upon the barges to show that this violation could not have contributed to the collision, and not whether it did so contribute. We do not think the barges met this heavy burden.
 
 
 51
 "In The Eagle Wing, D.C., 135 F. 826, at page 832, Judge Waddill stated: `The faults on the part of the Eagle Wing consist not only in error and negligence on the part of her navigators in the management and control of the vessel, but there was an initial fault, serious in its character, in that an important statutory requirement was violated in the selection of the vessel's mate. He was an unlicensed mate, employed contrary to section 4438 of the Revised Statutes, as amended by act of December 21, 1898, c. 29, 30 Stat. 764 (U.S.Comp.St. 1901, p. 3034) [46 U.S.C.A., § 224]; and, moreover, he was a person that it is highly probable would never have been licensed. The duty to observe this statute is imperative, and all must respect it, whether they approve of its wisdom or not; but that it is founded upon the highest considerations of the laws of humanity, looking to the safety of life and limb and the preservation of property, goes without saying. The failure to comply with statutory requirements and regulations has frequently received the severest condemnation of the courts, and, when such an omission is clearly established, the presumption is that it did contribute to the collision, unless the contrary is obviously apparent, and this presumption attends every fault connected with the occurrence; and a further obligation is imposed to show not only that it probably did not so contribute, but that it could not have done so. Pennsylvania v. Troop, 19 Wall. 125, 22 L.Ed. 148; Martello v. Willey, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637; The Bernicia, D.C., 122 F. 886; The Alabama [4 Cir.] 126 F. 332, 61 C.C.A. 238.'
 
 
 52
 "Again, in The City of Baltimore, 4 Cir., 282 F. 490, 493, (then) Circuit Judge Waddill stated: `She was being navigated by a person without a master's license, in a busy harbor, and in open violation of the law applicable to her (Comp.St., §§ 8190, 8200 [46 U.S.C.A. §§ 224, 405]; Inspector's Rules (1916) V, § 19), and, in such circumstances, it is incumbent upon her to show, not only that the absence of a licensed master did not enter into the occurrence, but that it could not have done so.'
 
 
 53
 "Even stronger are the words of Circuit Judge Denman in The Denali, 9 Cir., 105 F.2d 413, at page 418: `The rule simply is that the violator is penalized with the burden of showing that the violation not only probably did not cause the accident, but that it could not have done so. This burden it is frequently extremely difficult, if not impossible, for the violator to discharge, in the nature of things; and herein lies the true penalty imposed upon him.'
 
 
 54
 "* * *
 
 
 55
 "Under the record before us, we think the barges have utterly failed to meet the heavy burden placed upon them by their violation of the statutory regulations as to the manning of the barges. The barges, accordingly, must be held liable, and the owner must be denied limitation of liability."
 
 
 56
 In Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189, petitioner owned a deck scow and chartered his boat by oral contract to respondent. Following the demise, the scow capsized and dumped her cargo. Respondent, as bailee of the cargo, sued petitioner as owner of the scow. Petitioner sought limitation of liability under the provisions of 46 U.S.C.A. § 183, but the District Court, finding that the scow was unseaworthy at the time of the demise, refused limitation of liability. The Court of Appeals concurred in this finding, and affirmed the trial court's decision "upon the ground that as the charter was the personal contract of the owner and included an implied warranty of seaworthiness the petitioner was precluded from the benefit of the limitation statutes." The court said (290 U.S. p. 88, 54 S.Ct. p. 11, 78 L.Ed. 189):
 
 
 57
 "We pass, without discussion, the contentions that the court below erred in its rulings that the owner's contract was personal and that the respondent as bailee of the cargo was entitled to recover from the charterer, as we are of opinion that both points were correctly decided (The Benjamin Noble [D.C.], 232 F. 382; Id. (C.C.A.) 224 F. 95; Capitol Transportation Co. v. Cambria Steel Co., supra [249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631]; Pendleton v. Benner Line, supra, [pages] 355-356 [of 246 U.S., 38 S.Ct. 330, 62 L.Ed. 770]), and come to the question of petitioner's right of limitation notwithstanding the implied warranty of seaworthiness. The Capitol Transportation Case is an authority against the right. As appears by the opinion of the District Court (The Benjamin Noble, 232 F. 382), the contract of the owner in that case was oral and no express warranty was given.
 
 
 58
 "We see no reason to restrict or modify the rule there announced. The warranty of seaworthiness is implied from the circumstances of the parties and the subject-matter of the contract and may be negatived only by express covenant. It is as much a part of the contract as any express stipulation. Delaware & Hudson Canal Co. v. Penna. Coal Co., 8 Wall. 276, 288 [19 L.Ed. 349]; Grossman v. Schenker, 206 N.Y. 466, 469, 100 N.E. 39; United States v. [A.] Bentley & Sons Co. [D.C.], 293 F. 229."
 
 
 59
 See also Coryell v. Phipps, 317 U.S. 406, p. 410, 63 S.Ct. 291, 293, 87 L.Ed. 363, where the court said:
 
 
 60
 "Petitioners press several lines of cases on us. We are not concerned here, however, with the question of limitation of liability where the loss was occasioned by the unseaworthiness of the vessel. The limitations acts have long been held not to apply where the liability of the owner rests on his personal contract. Pendleton v. Benner Line, 246 U.S. 353 [38 S.Ct. 330, 62 L.Ed. 770]; Luckenbach v. McCahan Sugar Co., 248 U.S. 139 [39 S.Ct. 53, 63 L.Ed. 170]; Capitol Transportation Co. v. Cambria Steel Co., 249 U.S. 334 [39 S.Ct. 292, 63 L.Ed. 631]. As stated by Chief Justice Hughes in American Car and Foundry Co. v. Brassert, 289 U.S. 261, 264 [53 S.Ct. 618, 619, 77 L.Ed. 1162], `For his own fault, neglect and contracts the owner remains liable.' And that exception extends to an implied as well as to an express warranty of seaworthiness. Cullen Fuel Co., Inc., v. Hedger [Co.], Inc., 290 U.S. 82 [54 S.Ct. 10, 78 L.Ed. 189]."
 
 
 61
 It follows that the action of the District Court in rendering judgments in favor of the Rowes against Dallas Eugene Hodge, William E. Hodge, Miles S. Brooks, Frank Carr, and Mr. and Mrs. Charles G. Rosson, will be affirmed; that the District Court's action in limiting the liability of Miles S. Brooks and Frank Carr to $600.00, the value of their wrecked motorboat, will be reversed and this cause will be remanded for entry of judgments against Brooks and Carr in the full amounts heretofore rendered against William E. Hodge, Dallas Eugene Hodge, and Mr. and Mrs. Charles G. Rosson.
 
 
 62
 Affirmed in part, reversed in part and remanded.